Argued October 13, affirmed October 26, 1955, argued on
rehearing January 25, reversed June 27, 1956

# ACKERMAN *v.* PHYSICIANS AND SURGEONS HOSPITAL

288 P. 2d 1064
298 P. 2d 1026

*Dwight L. Schwab,* Portland, argued the cause for appellant. With him on the briefs were Cake, Jaureguy & Hardy and Jonathan U. Newman, Portland.

*Cleveland C. Cory,* Portland, argued the cause for respondent. With him on the brief were Hart, Spencer, McCulloch, Rockwood and Davies, Hugh L. Biggs and George H. Fraser, Portland.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN and PERRY, Justices.

## PER CURIAM.

The plaintiff-appellant Dolores Ackerman brought an action against the defendant-respondent Physicians and Surgeons Hospital, an Oregon corporation (hereinafter called the hospital), for damages for injuries which she alleges were sustained as a result of respondent's negligence while she was a patient in the hospital. The jury returned a verdict in her favor but the court thereafter, on motion, entered judgment notwithstanding the verdict, resulting in a dismissal of plaintiff's complaint. It is from that judgment she appeals.

The motion for judgment *non obstante veredicto* was grounded on the premise that the evidence conclusively showed that the hospital at the time appellant suffered her injury was "an eleemosynary corporation organized and existing under and by virtue of the laws of the State of Oregon as a non-profit corporation, without capital stock or any provisions for making or distributing dividends or profits, for the purpose

of owning and operating a general hospital." The order which followed and the court's memorandum opinion hereinafter referred to reveal that the court was so persuaded in making its now challenged judgment.

Two questions are projected for consideration by the record. First, is the respondent corporation an eleemosynary corporation? Second, if so, does it enjoy immunity for acts of negligence of the kind here sued upon?

■ We will give answer to these propositions in the inverse order of their presentation. The question relative to the immunity of the respondent hospital, if in fact a charitable institution, is foreclosed adversely to the appellant by *Landgraver v. Emanuel Lutheran Charity Board, Inc.*, 203 Or 489, 280 P2d 301, decided February 9, 1955. The Landgraver decision was handed down subsequent to the filing of the briefs in the instant appeal.

The holding in the Landgraver case does not, however, conclude the only other and very important question concerning the claimed charitable character of the respondent hospital, for if it is not an eleemosynary institution, then it must respond to a judgment for damages accruing by reason of its negligence. In answer to this last question, we find ourselves in agreement with the lower court. Its learned, careful and painstaking opinion so fully covers the subject discussed that we adopt it as our own. That which follows is the circuit court's memorandum opinion in its entirety except for certain minor changes by way of interpolation or excision designed to make it more nearly and appropriately conform to the record as we find it or to adapt it in form as the opinion of this court:

The only question as to the corporate character of the hospital is this: Was there any substantial evidence on the basis of which the jury could decide the defendant hospital was not a *charitable corporation*? This issue was presented to the jury under appropriate instructions defining charitable corporations.

■ As to the organization and conduct of the hospital, the facts addressed to this issue are undisputed. The issue thus becomes one of law and if it is decided that all the evidence, together with reasonable inferences to be drawn therefrom, fails to establish legal liability, i.e., that there is no substantial evidence establishing liability, then it follows that the motion for judgment n.o.v. was properly allowed. The facts are these:

The defendant hospital was incorporated as a charitable and nonprofit corporation as of July 1945 under the provisions of ORS 61.010 to 61.160. There were 15 original incorporators who advanced approximately $70,000, which was repaid to them without interest. There is no capital stock, no dividends, no salaries to staff nor to individuals. The only salaries go to employes. Excess of income over expenses is disbursed for improvement of facilities, equipment, purchase of a lot for future use, extension of the physical plant and matters incidental to the hospital operation. Physical properties and so forth go to charity in the event of dissolution of the corporation. Policy is determined by a board of governors, and staff members must be approved by this board. No patient may be treated except by a member of the staff. There are 132 staff members, about adequate for an operation of this size. Under the avowed and practiced policy as disclosed by the evidence, all persons are admitted without discrimination as to race, color or creed and

regardless of ability to pay, although inquiry is always made at the time of admission and those who can pay are charged prevailing rates. Frequently collection agencies are employed to collect money owing, although charity patients are not billed. There is no evidence of any person being denied hospitalization because of inability to pay.

The 132 staff members bring their patients to the hospital and its facilities are available to such staff doctors on the same basis as the 15 founding doctors. Gifts such as furniture, equipment, surgical instruments, some cash, books, and labor have been made. There is free use of facilities to the Volunteers of America and others; also radium is made available. Certain aspects of vocational training are provided and some scholarships and nurses' training courses are maintained.

There is no trust fund, as such, separate from general assets, although all assets are held subject to the original incorporation and conduct thereunder and revert to charity generally on dissolution. Gross income runs about $750,000 annually with a net of $60,000 to $75,000. About $28,000 is entered on the books as charity accounts and approximately $100,000 is carried as uncollectible accounts. The staff members pay nothing for use of the hospital facilities. Value of hospital properties is about $650,000. Donations are not too accurately valued but approximate $15,000.

In 1951, the year plaintiff was injured, 5,656 bed patients were "discharged" from the hospital and 4,184 patients were treated in the outpatient department, and in 1950-51 there were about 24 charity patients. The fact is established that the proportions of charity patients to all patients and of charity reflected in cash or its equivalent to gross cash income are

very small. These are substantially all the facts pertinent to the question as to whether defendant is a charitable corporation.

The plaintiff-appellant argues as follows: Defendant hospital has the burden of proving that it is a charitable corporation, and rarely is a verdict directed in favor of the party having such burden. The jury may not have believed the defendant's witnesses. They were not required to do so. The uncontroverted testimony is that the hospital hires collection agencies to collect at least some of its unpaid accounts. " 'The jury was entitled to conclude that some of these unpaid accounts turned over to the tender mercies of professional collectors were actually charity cases—persons bona fide unable to pay and needing help.' " Again: " 'Well might the jury conclude that charity is the exception, and not the rule, at defendant hospital, and that bona fide charity cases are rejected as such and treated as regular customers. Is the jury required to conclude that the hospital is living up to its high ideals as set forth in its Articles when the evidence shows that .0012% of its patients are charity cases? Could no reasonable jury infer from the evidence that collection agency cases are really charity cases?' "

The appellant thereafter discusses *Hamilton v. Corvallis Hosp. Ass'n,* 146 Or 168, 30 P2d 9, and *Gregory v. Salem General Hospital,* 175 Or 464, 153 P2d 837, and proceeds with consideration as to whether or not the staff physicians do not receive some gain, profit or private advantage, saying:

> " 'Certainly none of the founding doctors got, or gets, cold cash dividends. But that is not the only thing men work for. There are many other things of value. By obtaining this hospital the 15 purchasing doctors absolutely assured themselves

of a hospital in which to practice their profession until they died. Was not the jury entitled to infer a gain or a private advantage from that one fact alone? The most beautiful part of the arrangement too is that it didn't cost these doctors one red cent. The testimony showed that a doctor cannot long practice his profession successfully without a hospital to which he may take his patients. * * The by-laws provide that the hospital is governed by the governors. They have absolute power of decision as to policy making, rules and regulation. Everything must funnel through them as governors. They rule the roost as absolutely as any dictator. * * Is this power a private advantage? Is the jury to be foreclosed from determining that the hospital is run by and for at least the partial advantage of these original 15? * * Add all this together and the enormity of the private advantage to the governors (the original 15) is overwhelming in its scope. What is to prevent the jury from properly inferring that the governors are able to at all times insist on absolute subservience on the part of the staff? * * Surely, it may be argued that there is no direct evidence of this, but the jury may properly draw the inference from the uncontroverted evidence as to the corporate setup. * * Furthermore, cannot the jury determine that such right is a gain and private advantage in the private practice of these men in purchasing their own supplies? * * Cannot the jury infer that when the yearly profits are spent that equipment will be purchased that best serves the specialty or practice of one or more of the privileged 15? * * Possibilities and probabilities of gain, indirect profit and private advantage saturate the picture. It cannot be said that the defendant, with the burden of proof, has precluded the jury from determining that defendant is not charitable * *.' "

The question of hospitals and their operation as charitable corporations has had the consideration of

this court in several cases, two of which we consider determinative of the questions here presented. The first is *Hamilton v. Corvallis Hosp. Ass'n,* supra, where we find at pp. 176-7:

> "The question of whether a hospital is maintained for the purpose of charity of [sic] for that of profit is to be determined not only from the powers defined in its charter but from the manner in which it is conducted  *  *  *.
>
> "* * * * *
>
> "The overwhelming weight of authority is to the effect that a hospital association organized and conducting its business as a charitable institution is not liable for injuries suffered by its patients due to the negligence of its employees  *  *  *."

After detailing the facts in that case, the court reached the conclusion that the question of charitable corporation was properly submitted to the jury, the pertinent feature of the evidence apparently being that defendant, although organized as a charitable institution, was actually being conducted as a profit-making enterprise in the interest of the holders of its second mortgage bonds, said bonds having been issued by the defendant corporation and delivered to a trustee to be held for the benefit of the stockholders of the original corporation. The court, at p. 186, cited with approval 11 CJ 303, Charities, § 9, and said:

> "* * *  the principal and distinctive characteristics of charitable institutions are that they 'derive their funds mainly from private and public charity and hold them in trust for the object of the institution. In other words, the test of whether an enterprise is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage  *  *  *.'"

It is further said in 11 CJ 303, Charities, § 9:

> "* * * Their [charitable corporations] principal and distinctive features are that they have no capital stock and no provision for making dividends or profits, but derive their funds mainly from public and private charity and hold them in trust for the object of the institutions * * *."

In *Gregory v. Salem General Hospital,* supra, we held that the evidence brought the defendant within the definition of a charitable institution as that term is defined in *Benton Co. v. Allen et al.,* 170 Or 481, 133 P2d 991, and in *Hamilton v. Corvallis Hosp. Ass'n,* supra. The opinion in the Gregory case details the history and organization of the Salem General Hospital and the method in which it conducts its business, conforming in all substantial respects to the factual situation involved in the instant case. On trial in the Gregory case, a verdict was directed in favor of defendant. This was affirmed on appeal. We quote from p. 470:

> "The trial judge directed a verdict for the defendant pursuant to a belief that under the decisions of this court a charitable institution is not liable for an injury negligently inflicted by one of its employees. The crucial issue submitted by this appeal is whether or not a charitable institution is liable for its negligence * * *."

We thereafter reviewed authority and, applying the rule of stare decisis, recognized and upheld the principle of nonliability and held there was no jury question on the basis of the uncontradicted testimony.

In these cases the governing principles for determination of the issue of charitable corporations were the same, but different conclusions were reached in the Hamilton and Gregory cases because of different factual situations. The law is thus crystallized and it

is the application of law to facts that concerns us—or rather in this case of determining whether a jury question is involved in uncontradicted evidence evaluated by our declared case law.

It is true that the defendant hospital has the burden of proof to establish its existence and operation as a charitable corporation with no gain, profit or advantage to any individual. The recital of the evidence above sustains this burden. There is not a scintilla, let alone any substantial evidence to the contrary. All the *indicia* of charitable corporations are present in the hospital's organization, incorporation, management and control. Its legal setup and its actual operation conform to all requirements. Mrs. Ackerman's argument that, though nominally so organized, the hospital is actually not living up to its obligation as a charitable corporation, is grounded on suspicion and not on proof of any fact or reasonable inference therefrom. Appellant criticizes the small amount of charity, the few charity patients, the few dollars actually allocated thereto, the lack of any *specific* trust fund and the small amount of gifts as indicative of a *nominal* rather than a *real* charity, and argues the jury may so infer. However, in the light of positive evidence covering all elements necessary to immunize defendant hospital from tort action, we cannot recognize such suspicions as substantial evidence. The fact that gifts are few, charity patients limited in number and amounts devoted thereto small, does not justify an inference that defendant has abandoned its charitable concepts and is, in fact, operating for profit. Actual demands on charity, if met, are sufficient to establish a charitable operation. The volume of charity is of minor consequence. As to trust funds, all assets accumulated and accumulating are so held.

There is no gain, advantage or benefit accruing to any person as a result of the respondent hospital's operation that contravenes its charitable character. Plaintiff does not contend any persons gain financially from cash receipts or in any other manner from the hospital operation but asserts that the 132 doctors on the staff have a special advantage accruing by use of the hospital facilities without cost. Concerning this the appellant argues that this use of the facilities without cost is of great value to the doctors on the staff for the reason that no doctor can carry on a very extensive practice without accessibility to a hospital and this availability of the respondent hospital's facilities is therefore in the nature of a gain, benefit and advantage personal to the staff doctors. It does not appear that the staff physicians occupy other than the conventional relationship existing between doctor and hospital. So long as the number of staff doctors is not so limited as to suggest a monopoly, and surely this may not be suggested here, the incidental advantage of having a place to treat charitable and other patients does not stamp it as a benefit which, if existent, renders a corporation noncharitable.

In *Benton Co. v. Allen et al.,* supra, we said, at p. 492:

"* * * It might be argued that this exemption indicates that the corporation is operated to some extent for the private profit of those pioneer physicians who founded the hospital, but, bearing in mind that the hospital was in operation for some three years before the reorganization and that some control over the personnel of the medical staff by the trustees of the hospital is desirable, we think that the preference which was thus given to the pioneer physicians, whose medical and surgical skill and

whose ethical character were known, in itself, would not affect the corporation's charitable character.''

█ If it be the law that, under the circumstances of this case, a *benefit, gain* or *advantage* accrues to staff physicians, then there can be no charitable corporation. There is, in our opinion, no evidence in this case justifying submission to the jury of the issues here presented. The motion for judgment n.o.v. was properly allowed.

Affirmed.

## ON REHEARING

ON REHEARING

*Dwight L. Schwab,* Portland, argued the cause for appellant. With him on the briefs were Cake, Jaureguy & Hardy and Jonathan U. Newman, Portland.

*Cleveland C. Cory,* Portland, argued the cause for respondent. With him on the brief were Hart, Spencer,

McCulloch, Rockwood and Davies, Hugh L. Biggs and George H. Fraser, Portland.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, LATOURETTE and PERRY, Justices.

PER CURIAM.

This is a rehearing petitioned for by plaintiff. Our original opinion was handed down October 26, 1955, wherein we affirmed a judgment non obstante veredicto in favor of the defendant. In so doing we sustained a finding that the evidence conclusively showed that the defendant hospital was an eleemosynary institution at the time of plaintiff's injuries and, as such, was exempt from liability arising out of the negligence of its employee.

■ The sole issue presented by the plaintiff's petition, as well as in the original appeal, is whether or not the defendant institution is, in fact, eleemosynary in character, for as we said in our original opinion: "* * * if it is not an eleemosynary institution, then it must respond to a judgment for damages accruing by reason of its negligence." 288 P2d 1064, 1065.

■ We preface what follows by noting that on appeal from a judgment notwithstanding the verdict the evidence will be construed in the light most favorable to the plaintiff. *Baird v. Boyer,* 187 Or 131, 140, 210 P2d 118; *Callander v. Brown,* 181 Or 279, 282, 178 P2d 922.

■ Immunity from liability upon the ground of being a public charity is an affirmative defense and therefore the burden of establishing the eleemosynary character of the institution was upon the party asserting that defense. *Walsh v. Sisters of Charity of St. Vin-*

*cent's Hospital,* 47 Ohio App 228, 191 NE 791, 792. Also see 14 CJS 551, Charities, § 75.

■ Hospitals, as such, are not necessarily public charities. "The articles of incorporation are prima facie evidence of the character of the corporation as a charitable institution, but prima facie evidence may be rebutted by evidence that in fact the corporation has not lived up to its chartered objects." *Benton County v. Allen et al.,* 170 Or 481, 484, 485, 133 P2d 991; *Hamilton v. Corvallis General Hospital Association,* 146 Or 168, 176, 30 P2d 9; *White v. Central Dispensary and Emergency Hospital,* 69 App DC 122, 99 F2d 355, 119 ALR 1002.

We turn our attention to the various tests of the eleemosynary character of an institution as established by this court in previous decisions in an effort to determine whether or not there was any substantial evidence presented during the trial below from which the jury might justly conclude that the defendant hospital was not a charitable institution.

In *Corporation of Sisters of Mercy v. Lane County,* 123 Or 144, 155, 261 P 694, this court, quoting from 30 CJ 462, stated:

"The test which determines whether a hospital is charitable or otherwise is its purpose; that is, whether it is maintained for gain, profit, or advantage, or not. * * *" See 14 CJS 416, Charities, § 2.

Also see *Hamilton v. Corvallis General Hospital Association,* supra, at page 186.

We now reexamine the evidence bearing on the question of "whether it [the defendant] is maintained for gain, profit, or advantage." The forerunner of the defendant institution, and which occupied the same

premises, was a private hospital known as the Coffey Memorial Hospital. After the death of Dr. J. R. Coffey, his estate indicated a desire to sell the hospital and its assets. Thereupon a group of 15 doctors, later referred to as the founders, some of whom had previously practiced at the Coffey Hospital, associated themselves for the purpose of purchasing the Coffey Hospital. Some of the reasons motivating their action are found in the testimony of Dr. Manville, one of the founders, which follows:

"Q  Will you tell the court and jury why Physicians and Surgeons Hospital was incorporated and what type of a corporation you and the other incorporators sought to make? Let's start,—why was it incorporated?

"A  The Coffey estate, upon the death of Dr. J. R. Coffey, who was the oldest son of the original founder, upon his death the estate desired to sell the hospital. For myself, I had been practicing there for several years. It seemed like home. I wanted to continue to practice there if it were at all possible. So with myself and 14 other doctors, some of whom had practiced at the hospital the same as I had for some little time, we formed a group for the purchase of the hospital, which was done, and it was organized on a non-profit, charitable basis for the purpose of carrying on the practice of medicine, for making available in this community hospital services, which were—of which there was a definite shortage at that time, and to serve this community to the best of our ability in a hospital that we could continue running under the high standards before—on which it had been existing before."

Pursuant to an understanding with the Coffey estate, the founding doctors advanced $70,000 from their own funds as a down payment. The balance of the $250,000 purchase price was secured by a mortgage

to the Coffey estate. Articles of incorporation were prepared and the defendant hospital was incorporated in June, 1945, under its present name as a charitable, non-profit institution under the provisions of ORS 61.010 to 61.160. Article III of its charter reads in part as follows:

"This corporation is a purely non-profit corporation and is not formed for the purpose of pecuniary profit, and no portion of this corporation's income, profit or surplus shall ever be devoted or paid over or used in any way for the benefit of any of its members, or the pecuniary benefit of any private individual."

Later in the corporate organization the 15 founding doctors were known as "the members" of the corporation, and still later the name "governors" was substituted by the by-laws (July, 1951) for the term "members". "The members" together constituted the body which periodically selected from its own number the six trustees, one of whom was an alternate trustee. The trustees in turn were the active managing body of the hospital. We shall, from this point on, refer to the founding doctors as "the members". This makes the internal organization of the hospital somewhat unique in that it vests absolute control of the institution in the 15 members who were the founding doctors. All power, control and authority in the corporation consequently flows from the founders. These men, according to the testimony of W. G. Lamer, defendant's administrator and its executive officer, remain in office until they either resign, die, or quit practicing medicine.

We note that the successful operation of the corporation made it possible in the years following to repay to the 15 founding members all but $1.00 each of the $70,000 originally advanced by them. Each mem-

ber maintains this token investment in order to comply with certain corporation laws of this state which require officers of a corporation to be interested parties. The corporation was organized without capital stock. No dividends have been paid, nor are there any provisions for the payment of dividends. During the life of the corporation no salaries, premiums, or rewards have ever been paid to any member of the staff or other individuals other than to employees. Income over and above operation expenses is directed to better patient care, equipment, buildings or such charity as the hospital extended and which charity is later referred to. Salaries are paid only to regular employees. There is no discrimination made with respect to the admission of patients because of race, creed or color.

The hospital had a medical staff at the time of trial numbering about 132 doctors. Medical policies are determined by this staff subject to the approval of the trustees. Appointments to the medical staff are made by the trustees for a period of one year. The staff members are entitled to use the facilities of the hospital but they have no control over the internal management of the corporation.

Plaintiff argues that this complete and absolute control of the respondent hospital was, and is, a gain or private advantage to the governors. Plaintiff also claims that since the appointment of doctors to the medical staff must be approved by the board of trustees each and every year, the members of the medical staff would not wish to incur the displeasure of the board by failing to support any of the medical policies recommended by the governors. In addition, argues the plaintiff, all the equipment, facilities and prestige of this modern hospital are available to the governors for life at no cost to themselves.

Plaintiff emphasizes the provision in Art I, § 1 of the Modified By-laws of 1947, reading:

"Provided, that any child or children of an active member who has died or has resigned may become an active member herein by meeting all of the requirements above specified [the qualifications that the founding members imposed upon themselves] save and except the practice period of Five (5) years which in this particular instance shall be cancelled."

and maintains that a jury could infer from that by-law that the medical governors thereby created for their sons or designees the same private advantages accruing from the control of the hospital as they themselves now enjoy, one of which is the assurance that their offspring will have positions of control in a successful hospital should they choose to enter the field of medicine. Plaintiff also asserts that the right to designate one's successor could be made the subject matter of a contract, and that a governor, desiring to sell his right to nominate a successor, might accrue a substantial consideration for this right.

In essence then, the position of the plaintiff is that, while it is true that the defendant corporation is not conducted for a profit in the ordinary sense of the word, there is a definite gain or advantage accruing to the founding members by reason of the existence of the corporation, there being, among other things, the assurance of a lifetime opportunity to practice their chosen profession in a modern metropolitan hospital as well as accessibility to the facilities, prestige and security necessarily flowing from association with such an institution.

■ We deem the provisions in the by-laws which vest lifetime control in the founders and which allow

them to designate their successors by will are elements of valuable private advantage which a jury might properly consider in determining whether the defendant hospital was or was not operated for private advantage.

In *Hamilton v. Corvallis Hosp. Ass'n,* supra (146 Or 181) we said:

> "A charitable organization is defined * * * as * * . *
>
> " 'A corporation, the object of which is to provide a general hospital for sick persons, having no capital stock nor provision for making dividends or profits, deriving its funds mainly from public and private charity, and holding them in trust for the object of sustaining the hospital * * *.' "

The record shows that the total value of gifts, donations, bequests, etc., received by defendant corporation since its creation in 1945 has been very small. A substantial proportion of the amount received since that time has been donated by the hospital "members" themselves. Yet even these "donations" on the part of the members lose meaning, as such, when we examine Art XI of the Supplemental Articles of Incorporation for it is there provided that in the event of the corporate dissolution the donations made by its members shall be repaid to them after payment of corporation debts and obligations. The donations of the members are therefore in a sense contingent charities, or contingent debts of the hospital. The introduction of evidence respecting charitable donations was obviously an attempt by the defendant to meet one of the tests of the charitable character of a corporation as laid down in the Corvallis Hospital case, supra.

We do not say that there is any one principal and distinctive characteristic of a charitable institution as distinguished from a noncharitable institution. The

fact that an institution, in all other respects eleemosynary in status, can support itself and its charitable enterprises directly from the profits accrued from normal business operation does not, we think, jeopardize such an institution's character as a public charity. Source of income, however, along with all the other evidence, is an indicia of the character of a charitable institution which compels consideration.

Not only have we held in the Corvallis Hospital case that a distinctive characteristic of an eleemosynary institution is the fact that it derives its funds mainly from public and private charity but we have also said that once such funds are collected they are held in trust for the objects of the institution claiming a charitable character.

Concerning the donations received by the hospital since its formation, the following testimony of Mr. Lamer, its Administrator, makes it appear that these donations have not been treated as trust funds and conserved or invested as is usual with funds of this character:

"Q Do you have any separate trust funds that are administered by the trustees or any group of trustees, on behalf of the hospital?

"A No, sir. I would say that the money referred to [meaning the donations approximating $15,000] a few minutes ago on those items all are still intact to—in case of a time that you couldn't meet your monthly payment.

"Q Do you have any income from any trust funds which are administered? A No, sir."

We are impelled, by the testimony of defendant administrator, to observe, in the words of the Corvallis Hospital case, that:

"An important feature of this case is the absence of any charitable trust for the defendant to

administer. There is no income from a fund or funds created by contributions of benevolent and charitably minded persons to be used by the association in the relieving of the distress of the needy * * *."

We turn again to Mr. Justice BAILEY's opinion in the Corvallis case for another criterion of charitable character, where he says:

"The question of whether the hospital is maintained for the purpose of charity or for that of profit is to be determined not only from the powers defined in its charter but from the manner in which it is conducted * * *."

The following is a table of figures compiled from the testimony of the Hospital Administrator:

|         | Gross Income | Net Profit  | Charity Account |
|---------|--------------|-------------|-----------------|
| 1945-46 |              |             | $ 3,792.25      |
| 1946-47 |              |             | 2,463.67        |
| 1947-48 |              |             | 2,183.57        |
| 1948-49 |              |             | 1,754.06        |
| 1949-50 |              | $ 75,936.46 | 5,631.21        |
| 1950-51 | $777,956.91  | 65,723.00   | 842.43          |
| 1951-52 | 839,994.23   | 95,721.25   | 6,210.14        |

The term "Charity Account", as used by the defendant for a given year, represents the aggregate of the cost for all patients that were admitted during the year as charity patients and from whom the hospital had never had any expectation of receiving any remuneration for its services.

The only figures furnished as to annual gross income and annual net profit are those appearing in the foregoing table.

■ During the trial the plaintiff introduced evidence of the ratio of charity patients to paying patients.

This showed that the defendant ministered to about 19,680 persons during the year 1950-51. It also shows that only 24 charity patients were cared for during the same period. The Administrator testified that the waiting list for charity patients had been running 200 to 300 each month the year round, but did not represent that all on the waiting list were served by the hospital as charity patients. We have, in an earlier case observed that charity does not lose its character as such when it becomes sagacious (*Gregory v. Salem General Hospital*, 175 Or 464, 469, 153 P2d 837), and now add that financial sagacity and niggardliness are not synonymous terms.

■ The defendant hospital maintains no charity wards. It charges the "going rate" for all its services. There is charged off as bad debts about $25,000 a year, and this has been true for the past five or six years. But the mere failure to collect from some of its patients is not sufficient to convert a private corporation into a charitable institution. *Danville Community Hospital v. Thompson* (1947) 186 Va 746, 43 SE2d 882, 884, 173 ALR 525. As was well said in the Danville case: "Many corporations would be surprised to learn that such an experience produced such a result."

In the original opinion we noted that the defendant hospital had given free use of its facilities to the Volunteers of America and others, but neither the testimony nor the evidence indicates precisely what free services were supplied or the approximate value of these services. Indeed, the hospital's Administrator testified: "We have no record of that." Nor were records introduced by defendant showing that any services were performed. Nor was testimony given which would indicate to whom the services had been gratuitously rendered.

The trial court in its opinion noted testimony that radium was available to doctors without charge to be used in charity cases involving cancer. Further testimony showed that the usual charge for the use of this service was 2¢ per gram hour. We are unable to determine from the record whether the defendant corporation debits the amount of 2¢ per gram hour to its "charity account" or elsewhere whenever radium is furnished under these circumstances. If in fact it does debit its "charity account" on such occasions, the defendant's contributions to charity are no greater than those already considered. Inasmuch as we are bound to draw every inference in favor of the plaintiff upon this rehearing, must we not then infer that the hospital does debit its charity account in those instances wherein free radium is furnished?

This court in its original opinion refers to the vocational training, scholarships and nurses' courses maintained by the defendant. But in reexamination of the record we find there is a dearth of testimony as to the extent and nature of these activities. The record is extremely vague on this point. We are not certain whether the defendant gives one or several scholarships. It does, however, seem apparent that the corporation receives material benefits from these classes in that students are used to assist registered nurses in the performance of hospital duties.

■ As we said earlier in this opinion, there is but one issue before us for decision, i.e., is the defendant in fact a charitable institution? We have not undertaken to set forth all the facts from whence a jury might infer that the defendant was not a charitable institution but only sufficient facts to indicate that we are now of the opinion that the circuit court was in error in grant-

ing judgment to the defendant hospital non obstante veredicto.

Our former opinion, therefore, is withdrawn, the judgment of the lower court reversed, and a judgment on the jury's verdict in favor of plaintiff will be entered in lieu thereof.

ROSSMAN, J., specially concurring.

The defendant, Physicians and Surgeons Hospital, was incorporated under ORS 61.010 through 61.160 and the antecedents of those sections of our laws. Those enactments make provision for the incorporation of non-profit corporations. The type of corporation which the lawmakers had in mind when they adopted that legislation is indicated in part by ORS 61.130 which speaks of "telephone, power, water companies and cooperative associations." The enumeration is not complete, but it suggests the general nature of the non-profit corporations which may be organized under those sections. Other parts of the non-profit statute show indisputably that corporations organized under it are not eleemosynary in character. For example, ORS 61.080(2) says:

> "Corporations formed under ORS 61.010 to 61.130, by a vote of three-fourths of the members present at any such general or special meeting called for the purpose, may authorize the dissolution of the corporation and provide for the settling of its business and disposing of its property. * * * The assets of the corporation shall be divided in accordance with the interest of each member in the proportion of his contribution to the assets of the corporation."

Thus, a non-profit corporation may dissolve at any time and deliver its assets to "each member in the proportion of his contribution to the assets of the cor-

poration.'' If the assets increased in value prior to dissolution, those who receive their return are enriched thereby. Upon the other hand, a charitable corporation continues on forever (ORS 61.440) and can never return its properties to those from whom it received them or benefit them in any other manner. As recently as 1945 the legislature, in recognition of the fact that charities are created for objects of permanent benefit to the public, as acknowledged more than three hundred years ago in the Statute of Elizabeth, provided in Oregon Laws 1945, chapter 433, that a charitable organization ''shall thereafter be deemed a body corporate, with continued perpetual succession.'' This state has legislation for the creation of pure charities, as well as other legislation for the creation of non-profit and profit corporations. I think it is apparent that since the defendant was not created under a charity statute, it cannot be deemed a charity. I shall now call attention to supporting decisions.

*In re Beekman,* 232 NY 365, 134 NE 183, the court gave extensive consideration to a claim advanced by a wealthy corporation that it was a charity and exempt from the state's tax laws. In rejecting the contention, the court ruled: ''The articles of incorporation alone must determine whether a corporation comes within the exemption.'' It held that the articles of incorporation established that the corporation was not a charity. *Mohawk Mills Assn. v. Miller,* 260 App Div 433, 22 NYS2d 993, declares:

> ''The learned counsel for appellant in his oral argument and in his brief has stressed the point that the use to which appellant's income is applied is the ultimate test of the exemption. In support of that contention he has cited decisions of the Federal courts and the Board of Tax Appeals. In

the case before us these authorities have no persuasive force because they conflict with the decisions of our own courts. It has been held again and again that the right of a corporation to exemption must be determined from the articles of incorporation alone and that if any of its powers are not charitable, the corporation is not entitled to be classified as a charity."

In *Nicholas v. Evangelical Deaconess Home & Hospital,* 281 Mo 182, 219 SW 643, the court ruled: "We hold that defendant under its articles of association is a charitable organization." Some parol evidence was received which bore upon the nature of the organization. Referring to it, the decision said: "The parol evidence introduced by the defendant was not necessary to show defendant's charitable character, but it did not disprove it."

The following is taken from *In re First National Safe Deposit Co.,* 351 Mo 423, 173 SW2d 403:

"Northwestern Municipal Ass'n v. United States, 8 Cir., 99 F.2d 460, 461, is in point on the question of determining the purpose of an organization, as affecting its liability for income taxes. It was there said: 'The purpose of an organization must be determined from the purpose declared in the instrument creating it.' And in Helvering v. Colman-Tilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 287, 80 L. Ed. 278, the Supreme Court of the United States used this language: 'The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted.' And this court has said: 'A corporation as to its character is to be judged by the objects of its creation as expressed in its charter.' Wyatt v. Stillman Institute, 303 Mo. 94, 260 S.W. 73, 76. See, also, Hall v. Woods, 325 Ill. 114, 156 N.E. 258, and cases cited. There appears to be an exception

to this rule in determining whether a corporation is or is not a public utility. State ex rel. Buchanan Co. P.T. Co. v. Baker, 320 Mo. 1146, 9 S.W.2d 589.''

*Czech Catholic Union v. Satla Realty Corp.,* 160 Ohio St 545, 117 NE2d 610, held to similar effect as the above. The holding is succinctly stated in a head-note as follows:

"Actual character of corporation is determined by objects of its formation and nature of its busi-ness as stated in its articles of incorporation, and not by any limited but permissible activity in which, under its charter, it may choose to engage in tempo-rarily.''

The holdings of which notice has been taken are employed in actions wherein a hospital claims immunity from tort liability as is shown by *Morton v. Savannah Hospital,* 148 Ga 438, 96 SE 887.

From *Maretick v. South Chicago Community Hospital,* 297 Ill App 488, 17 NE2d 1012, the following is taken:

"As was said in Turnverein 'Lincoln' v. Board of Appeals, 358 Ill. 135, at page 142, 192 N.E. 780, at page 783: 'The appellant is a corporation, and, as a general rule, the character of a corporation and the object for which it was organized must be ascertained from its charter or certificate of incorporation. People v. Rockford Masonic Ass'n, 348 Ill. 567, 181 N.E. 458, 83 A.L.R. 768; People v. Rockford Lodge B. & P. O. E., 348 Ill. 528, 181 N.E. 432; People v. Wyanet Electric Light Co., 306 Ill. 377, 137 N.E. 834; Distilling Co. v. People, 161 Ill. 101, 43 N.E. 779.' ''

Other decisions to like effect are available.

It is true that many decisions, of which *Hamilton v. Corvallis General Hospital Assn.,* 146 Or 168, 30 P2d

9, is a good example, hold that the articles of incorporation of a purported charity are not conclusive and that evidence may be received which reveals the corporation's practices and treatment of those who deal with it. However, that manner of resolving the issue must be unsatisfactory. The formulation of instructions for the jury must be difficult, and even more difficult must be the application of the instructions by the jury. In a case tried today the jury might find that the institution, whether it be a hospital or a college, is non-charitable and, a year later, in another case, a different jury might find that the same organization is a charity. If the assessor and the income tax division gave effect to the judgments entered in that manner the institution would shuttle back and forth upon the tax rolls.

In view of the fact that the statute under which the defendant was organized does not permit the organization of charities, I think we ought to hold that for that reason the defendant is not a charity. It is, therefore, unnecessary to take note of the parol evidence. The defendant is bound by its own charter and cannot ask the court to construe it as a charity when, in fact, its nature is otherwise. The plaintiff was entitled to a ruling as a matter of law that the defendant was not a charity.

I concur in the holding of the majority, but the above are my reasons.