Herbert, J.
Although on the meager facts stated in the petition, none of which bear on or support the six specifications of alleged negligence, the writer of this opinion would have sustained the demurrer for plaintiff’s failure to comply with Section 2309.04(A), Revised Code, requiring that the petition must contain ‘ ‘ a statement of facts constituting a cause of action in ordinary and concise language,” it is apparent from the opinion of the trial court that its decision was based solely on determination of the question, “Can a religious and charitable organization be held liable on a tort action on the theory of ‘respondeat superior. ’ ” The Court of Appeals in reversing that judgment based its decision on the case of Avellone v. St. John’s Hospital (1956), 165 Ohio St., 467, 135 N. E. (2d), 410, *283 in which it was held that a corporation not for profit operating a hospital is liable under the doctrine of respondeat superior for the torts of its servants. The Court of Appeals went on to say that “we fail to see any legal distinction between such a corporation and a corporation not for profit having the purposes of a Young Women’s Christian Association.”
In the Tomasello case, the Court of Appeals for Cuyahoga County wrote no opinion. The opinion of the trial Judge in the Common Pleas Court of Cuyahoga County, where that case was first tried, is reported, however, in 6 Ohio Opinions (2d), 508, in which opinion the court takes the position that the charitable immunity doctrine (as termed therein) which has prevailed in Ohio for many years has not been changed by the Avellone decision except as to nonprofit hospitals. We assume for the purpose of this case, therefore, that the appellate court Judgment affirming the Judgment of the trial court there was based on the same position. It is unfortunate that such an important issue should be presented to this court on such a factually meager petition, but the conflict between those two appellate decisions is clear, and, accordingly, we approach the broader question on which those decisions turned.
Prior to 1956, the decisions of this court have held as a matter of public policy that a charitable or eleemosynary institution is not liable for tortious injury except (1) when the injured person is not a beneficiary of the institution, and (2) when the institution fails to exercise due care in the selection or retention of a negligent employee. Cullen v. Schmit (1942), 139 Ohio St., 194, 39 N. E. (2d), 146; Taylor v. Flower Deaconess Home and Hospital (1922), 104 Ohio St., 61, 135 N. E., 287, 23 A. L. R., 900; Rudy v. Lakeside Hospital (1926), 115 Ohio St., 539, 155 N. E., 126; Sisters of Charity of Cincinnati v. Duvelius (1930), 123 Ohio St., 52, 173 N. E., 737; Waddell, a Minor, v. Young Women’s Christian Assn. (1938), 133 Ohio St., 601, 15 N. E. (2d), 140; and paragraph two of the syllabus in Newman, a Minor, v. Cleveland Museum of Natural History (1944), 143 Ohio St., 369, 55 N. E. (2d), 575. See, also, 9 Ohio Jurisprudence (2d), 132, Section 49.
In 1956 in the Avellone case, this rule was re-examined and consideration was given to recent decisions in other states in *284 volving the question of immunity from liability of charitable institutions to their beneficiaries for torts committed by employees. The trend of those cited decisions marks a very considerable change in recent years in the course of the law in this field over the United States, ranging from the rule of complete immunity to the rule of complete liability. This court at that time greatly changed the above-stated Ohio rule so far as nonprofit hospitals were concerned and removed their previous immunity from liability to paying patients.
The doctrine of the Avellone case, to which this court is now firmly committed, was declared in Pierce v. Yakima Valley Memorial Hospital Assn. (1953), 43 Wash. (2d), 162, 260 P. (2d), 765, and has been supported in recent cases in other jurisdictions as, for example, Bing v. Thunig (1957), 2 N. Y. (2d), 656, 143 N. E. (2d), 3; Wheat v. Idaho Falls Latter Day Saints Hospital (1956), 78 Idaho, 60, 297 P. (2d), 1041; and Collopy v. Newark Eye and Ear Infirmary (1958), 27 N. J. (2d), 29, 141 A. (2d), 276.
The defendant in this case, however, aptly poses the question of law presented in these words:
“What is the present rule of public policy of Ohio with reference to respondeat superior tort liability or nonliability of a religious and charitable institution (not a hospital) in an action by a patron of such institution’s facilities.”
A very thorough and scholarly review of the development of law in the field of tort liability of charitable institutions is found in the opinion of Matthias, acting C. J., in the Avellone case, so that it would avail us little to again review exhaustively the cases available on this subject rendered prior to the decision in that case. An examination of the cases collected and annotated in 25 A. L. R. (2d), 1 to 200, and the supplements thereto, down to date clearly shows, however, the wide disparity and irreconcilable divergence among the decisions in the various jurisdictions in this country. Nothing would be gained by attempting to classify and collate in this opinion the various principles, philosophies or formulas now followed in the different states. Observations are made, however, of some recent developments.
In New Jersey, the Supreme Court in 1958 accompanied its *285 decision in the Collopy case, supra, with two other decisions, Dalton v. St. Luke’s Catholic Church, 27 N. J. (2d), 22, 141 A. (2d), 273, and Benton v. Young Men’s Christian Assn. of Westfield, 27 N. J. (2d), 67, 141 A. (2d), 298, thereby striking down immunity of churches, charitable institutions (such as the Young Men’s Christian Association) and nonprofit hospitals from liability to beneficiaries for negligence of employees. The Legislature there immediately enacted a statute immunizing religious, charitable and educational organizations as to tort liability to beneficiaries and limiting such liability as to nonprofit organizations operating hospitals to an amount not exceeding $10,000, which temporary 1958 statute was re-enacted on a permanent basis in 1959. The public policy of New Jersey therefore is now declared in a legislative enactment.
Section 19a, Article I of the Ohio Constitution, provides:
“The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law.”
From this constitutional provision and those of Article II, it would appear that our General Assembly has broad power to enact laws relating to the liability or immunity therefrom of religious, charitable and educational institutions for injuries, or wrongful death, to beneficiaries caused by the negligence of employees, or requiring proof of gross neglect in such cases, or financially limiting damages for injuries so sustained, but it may not financially limit damages in wrongful death actions lawfully brought. It may also remove immunities judicially established over the years.
Following the Avellone decision in 1956 which definitely changed the previously declared public policy as to nonprofit hospitals, the General Assembly took no steps in 1957. In 1959, however, Substitute Senate Bill No. 241 was passed — in the Senate by a vote of 29 to 1 and in the House by a vote of 93 to 32 — to provide:
“A nonprofit corporation, society, or association organized exclusively for religious, charitable, educational or hospital purposes shall not be liable by reason of the acts of its servants or agents for loss or damage arising from injury to or death of a beneficiary to whatever degree of the works or services of *286 such nonprofit corporation, society, or association, unless such injuries or death are caused by the gross negligence of the agent or servant of such • corporation, society, or association acting within the scope of his employment.
“Payment to a nonprofit corporation, society, or association for its works or services shall not exclude a person from being in the class of a beneficiary of such works or services. ’ ’
The Governor vetoed the bill, stating in his message:
“I am motivated in this veto with the need for the protection of the individual who is injured by the action of the agent of the aforestated groups and whose injury may be so extreme as to deprive him of being able to earn a livelihood, regardless of whether the negligence which led up to the injury was gross or de minimus. ”
The Senate repassed the bill by a vote of 25 to 4, but in the House the affirmative vote of 64 to 22 for repassage failed to attain the constitutional requirement of three-fifths of the members, so the bill failed. This recent legislative development is portrayed for the sole purpose of indicating the conflict of opinion presently existing in the legislative process of our state government.
In 1879, the Supreme Court of Rhode Island held that a hospital was liable to a paying patient for the negligence of an intern, stating that “in the absence of legislative provisions granting such exemption [to charitable hospitals] the exempttion could not be allowed, public policy requiring that duty assumed should be faithfully performed.” Glavin v. Rhode Island Hospital, 12 R. I., 411, 34 Am. Rep., 675. The court in that case also laid down the rule relating to care in the selection and retention of employees, which this court adopted in the case of Taylor v. Flower Deaconess Home and Hospital (1922), supra. In 1896, the Rhode Island Legislature enacted a statute to immunize charitable hospitals from liability for the negligence of their employees towards beneficiaries, which provision, in amended form, is still in effect (Title 7, Chapter 1, Section 22).
In the case of Basabo v. Salvation Army, Tnc. (1912), 35 R. I., 22, 85 A., 120, 42 L. R. A. (N. S.), 1144, the Supreme Court *287 held the defendant liable for injuries to third persons or strangers caused by the negligence of its servants, under the same rule which this court adopted in 1930 in the case of Sisters of Charity of Cincinnati v. Duvelius, supra.
To set forth the history of these various doctrines or philosophies, translated into declarations of public policy — sometimes judicial and sometimes legislative — as to immunity, limited immunity, or nonimmunity in the different states would belabor this opinion beyond all reasonable length, particularly, if we were to begin with Massachusetts where the rule of immunity was first established in this country under a false concept of English decisions — and where the rule still obtains.
Moving to the Pacific Coast, let us look, however, at the state of Washington where the former general rule of immunity obtained for many years. In the case of Pierce v. Yakima Valley Memorial Hospital Assn., supra, the Supreme Court of Washington held that “a charitable nonprofit hospital should no longer be held immune from liability for injuries to paying patients caused by the negligence of employees. ’ ’
Two years later the Supreme Court of Washington, in the case of Lyon v. Tumwater Evangelical Free Church (1955), 47 Wash. (2d), 202, 287 P. (2d), 128, held the defendant nonprofit religious organization immune from liability. In the opinion by Schwellenbach, J., it is stated:
“Appellant contends that the rule of charitable immunity has been rejected by the Pierce case, and that therefore the doctrine of respondeat superior applies to ecclesiastical bodies. * * * We do not wish to extend the above holding to apply to a nonprofit, religious organization which transports children, without charge, to and from Sunday school in order that they may receive a spiritual education and eventually become members of a church organization.”
Thus, Washington now has the rule of ordinary negligence as applied to a charitable hospital, but still follows the rule of limited immunity as applied to other charitable institutions.
Further comment on the many divergent views cited and annotated in 25 A. L. R. (2d), and supplements, supra, would only serve to bring us back to the question which the defendant *288 poses in this ease as to what is the present rule of public policy relative to liability or nonliability of religious and charitable institutions, except hospitals, as to beneficiaries.
Admittedly, the rule of public policy in Ohio as stated in paragraph one of the syllabus here has been established over a period of years by judicial declarations. Defendant’s question raises the further important question of whether changes in public policy in this field should be judicially or legislatively declared. The power of the court to revise previously declared rules of public policy is unquestioned, but the advisability of exercising such power presents the problem. Revision of an established policy should be made only when compelling reasons are set forth, as in the Avellone case. The majority of this court are of the opinion that similarly compelling reasons have not been established in this case.
A number of recent articles in various law reviews are worthy of note. In 7 Cleveland-Marshall Law Review (September 1958), 483, there appears an article entitled “Charitable Immunity: The Plague of Modern Tort Concepts” by Ronald M. Lipson. The article opens with a quotation from Justice Cardozo: “Law is indeed, an historical growth, for it is an expression of customary morality which develops silently and unconsciously from one age to another.” The author of the article stated (page 497): “There is little doubt but that the abandonment of charitable immunity is supported by the great weight of authority among legal scholars .The writer agrees that this is a correct view. The natural question stemming from such an opinion is to what extent charitable immunity should be rejected by the courts.”
In 11 Baylor Law Review (winter 1959), 86, is another very interesting article on “immunity of charitable institutions from tort liability” by John R. Feather. The article concludes with the following:
“The law is a social organ, a buffer between the clubs of irate men. It was designed to compensate for the inadequacies of self-help as a remedy for the conflicts arising from the social needs of men.
“Along with social needs go social whims and early com *289 mon law judges devised the ingenious system of stare decisis to protect the law from the latter. This protection was intended to be a shield and not a straight-jacket. If society, both public and private, were dormant and static, then an absolute adherence to stare decisis would be an ideal means by which the law of our ancestors could descend to the present. Such, however, is not the ease, and therefore flexibility, at least to a degree, must be an element of stare decisis.
“The predictability of the common law is the foundation, cornerstone, and framework of our legal system embodied in one attribute. Yet stability and rigidity can become injustice under a change of circumstances and for this reason stare decisis has its limits. These are more apparent in some areas of the law than others. This is particularly the case in the law of torts. Other areas change more rapidly, but they do so with a great deal more ease.
“The binding force of stare decisis is felt very strongly in the application of tort law, but eases and situations arise in which the need for a change is imminent. This becomes acutely apparent when a rule with dubious beginnings hangs on tenaciously in the face of a much needed change. Case after case will display the death throes of the old rule and at the same time the reluctance of the judges to overrule it.
“The questions of when and how a common law court, which must of necessity adhere to the fundamental principle of stare decisis, should change the existing law perhaps remain unanswered. As is apparent from the situation in which the doctrine of charitable immunity from tort liability finds itself, changes do occur. This fact implies that the questions have been considered and, whether properly or not, have been answered.
“The answer seems to lie in the balancing of opposites (the need for a change and stare decisis) until one over-balances the other and the law moves in that direction. In the case of the immunity of charitable institutions from responsibility for their torts, the need for a change or adjustment appears to be of sufficient weight to swing the balance of judicial consideration in favor of responsibility. At least if it appears to the individual judges considering such a case that such a need is *290 present, they should not bow to what is simply a guide to judicial decision. As important as it may be to follow stare decisis, it is a principle made to be used and not worshipped. ’ ’
To date, the Texas courts have not changed their rule of charitable immunity.
In 33 Connecticut Bar Journal (March 1959), 23, appears an article by Emanuel Margolis urging the abandonment of the charitable immunity doctrine in Connecticut. The article concludes :
“Given a doctrine which is out of harmony with constitutional and fundamental tort law, which is out of tune with present day economic realities, and whose articulated underlying public policies wither away under the light of close scrutiny —the practitioner of the law is entitled to expect its continued retention explicable purely in terms of some blind pursuit of stare decisis.”
In the article the author recognized that complete abandonment of the immunity rule could result in many so-called nuisance value suits but urges that public liability insurance will shift the burden of settling and defending against such claims to insurance companies.
The above-cited articles were followed by three written by Sister Ann Joachim, O. P., the first one in 26 Tennessee Law Review (spring 1959), 352, captioned “Charitable Immunity— Judicial or Legislative?,” the second one in 39 Boston University Law Review (summer 1959), 349, entitled “The Policymakers: Courts or Legislatures?,” and the third article in 45 American Bar Association Journal (August 1959), 822, captioned “Charitable Immunity: Why Abandon the Doctrine of Stare Decisis?” Their titles indicate the position of the author.
All those cited law review articles are enlightening and persuasive in their respective points of view, and they do serve to point up the question which now confronts this court. Unfortunately, perhaps, we do not have the prerogative of advocacy. We can only adjudicate.
Returning to the Avellone case, it is stated in the opinion (page 473) by Matthias, acting C. J.:
“* * * in the final analysis, the partial immunity of non *291 profit hospitals obtaining in Ohio at the present time * * * is based solely upon the general ground of public policy. The question before us is thus refined to whether the reasons for the public policy, which to this point has made nonprofit hospitals immune from liability as to patients, who cannot prove negligent selection of servants, still exist, if they ever did.
“The determination of such question involves simply the balancing of two ‘rights.’ On the one hand there is the well recognized right of nonprofit hospitals to any benefit and assistance which society and the law can justly allow them — a right which they command by their very nature; and on the other hand we see the right of the individual injured by the negligence of a servent to look for recompense to the master of such servant, under respondeat superior.
“Up to this point in the development of the law, this court has apparently felt that the benefit to society as a whole, gained by granting immunity, weighed the former right in favor of the latter, and this was on the ground that such masters were ‘different from others,’ and that immunizing them was ‘a valuable aid in securing the ends of justice.’
“In our opinion this conclusion is no longer justified. “Judicial attention is forced to the political cognizance, in the form of legislation, of the social consciousness of present day government. Such consciousness is evidenced by legislation providing for aid for the aged (see Section 5105.07, Revised Code), aid for dependent children (see Section 5107.10, Revised Code), reimbursement to hospitals for indigents injured by motor vehicles (see Sections 4515.03 to 4515.11, Revised Code), care for crippled children (see Sections 5103.12 and 5103.13, Revised Code) and poor relief (see Sections 5113.01, 5113.03 and 5113.04, Revised Code). In each of such aid programs there is provision for payment of hospital bills for beneficiaries.”
The matter of liability insurance and its availability is so thoroughly discussed in that opinion that it needs no further comment here. The reasons underlying the conclusion and judgment of the court in the Avellone case are clear however. Nonprofit hospitals are no longer operated as the charitable institutions which they were in the earlier days and their modern methods of operation are no longer comparable to those of *292 earlier days. Although the premise in the dissenting opinion of Putnam, J., in the Avellone case, that the majority opinion is grounded upon the opinion of Judge Rutledge in the case of President and Directors of Georgetown College v. Hughes (1942), 130 F. (2d), 810, is arguable, nevertheless the following excerpt from such dissenting opinion regarding that case is pertinent :
‘ ‘ The judgment was affirmed, but the court was not in agreement upon the grounds of the affirmance. Three of the judges agreed to affirm only because the plaintiff was a stranger to the charity. The other three, including Judge Rutledge, placed the affirmance on the broader ground that charity should not be immune as such. Consequently what is said therein upon this proposition is obiter and efficacious only so far as the arguments are persuasive. It might here be pointed out that under the Ohio rule the judgment would have likewise been affirmed.”
Judge Putnam went on to state :
“Public policy in Ohio should not be dictated nor circumscribed by public policy elsewhere.
U'% # #
“* # * if £here ig to be a change in our policy and law, let the Legislature do it after full hearings in which the representatives of all communities and charities affected may be heard. If public policy demands it the Legislature can act as it did in enacting Section 4515.02, Revised Code, limiting the liability of the driver host to his guest passenger.”
Going to the case of Foster v. Homan Catholic Diocese of Vermont (1950), 116 Vt., 124, 70 A. (2d), 230, 25 A. L. R. (2d), 1, sustaining a demurrer to a count in defendant’s answer pleading charitable immunity, Adams, J., stated in the opinion:
“The liability of private charities for injuries has never to our knowledge been passed upon by this court and we have no statute in regard to it. Counsel concede that it is an open question in this state. This leaves us free to act without constraint of any rule of stare decisis and in accordance with what we deem to be the law.”
On the other hand, in the case of Smith v. Congregation of St. Rose (1953), 265 Wis., 393, 61 N. W. (2d), 896, it is stated in the opinion by Currie, J.:
*293 “Ve find it unnecessary to explore into this question of historical background because this court has long felt that the reasons for granting such immunity to charitable and religious organizations, as well as to municipal corporations, are archaic, and if this court were not bound by the rule of stare decisis but were passing on the question for the first time, we would accord very little weight to the historical reasons originally advanced in support of the rule of immunity. However, we feel that it is for the Legislature and not this court to change the rule of immunity at this late date after its wide acceptance over the years in the prior decisions of this court. ’ ’
In 1944, the Supreme Court of Oregon decided the case of Gregory v. Salem General Hospital, 175 Ore., 464, 153 P. (2d), 837. The opinion by Rossman, J., concludes with this:
“The doctrine of stare decisis requires us to follow the rule that eleemosynary religious and educational institutions are exempt from liability for their acts of negligence. If a change is to be made in that rule, it will have to come * # * from the Legislature. The rule pertains, not only to hospitals, but to a wide variety of other institutions. A judicial change in the rule would affect not only the future, but would relate back to the period of limitation. The rule as employed by our courts has become firmly established in this state, and public policy demands that when an issue, especially one which affects property rights, has been deliberately determined by a court of last resort, it should be deemed settled and closed. We so deem the rule of nonliability now under consideration.”
That case has since been followed and approved in Ackerman v. Physicians and Surgeons Hospital (1956), 207 Ore., 646, 288 P. (2d), 1064.
In the Avellone case, in which the issue was presented on pleadings as in this case, the court felt that changed modern operating conditions of nonprofit hospitals required it to reject and abandon the previously declared public policy. Similarly compelling reasons are not established to the satisfaction of the majority in this case, particularly in the light of the recent legislative developments recited herein showing the conflict of views in the area of charitable immunity or liability. Therefore, we decline to again declare an extension or modification of *294 public policy. We feel that under these circumstances the doctrine of stare decisis should be applied and followed in order, if for no other reason, to avoid retroactive imposition of liability on a charitable institution which would result from the declaration of a different public policy — and we hold accordingly. Any legislative enactment declaring a different policy could only be prospective in its operation.

Judgment reversed.

Weygandt, C. J., Taft and Peck, JJ., concur.
Zimmerman, Matthias and Bell, JJ., concur in the judgment.