Argued October 29, 1970, re-argued January 7,
affirmed June 23, 1971

YUNDT, *Appellant, v.* D & D BOWL, INC.,
*Respondent.*
486 P2d 553

In Banc

*P. J. Washburn,* Roseburg, argued and reargued the cause and filed a brief for appellant.

*Eldon F. Caley,* Roseburg, argued and reargued the cause for respondent. With him on the brief were Long, Neuner, Dole & Caley, Roseburg.

BRYSON, J.

Plaintiff filed this action for damages for personal injuries incurred when she fell in defendant's bowling alley.

Plaintiff's complaint alleges that she was seated at a table overlooking the bowling lanes; that the floor material under the table was linoleum, with carpeting "surrounding the linoleum at a different level" and with a metal strip, or "carpet bar," between the carpeting and the linoleum. The metal strip was one-half inch, or less, higher than the linoleum. Plaintiff also alleges that she was seated on a chair "partly on the linoleum and partly on the carpet" and as she "attempted to rise from said chair and table" she "caught her heel on said metal strip and fell to the floor."

Plaintiff charged the defendant with negligence "in constructing a floor, partly linoleum and partly carpeting, where adjoined, with a metal divider protruding above the linoleum"; in placing a chair "astride the metal divider protruding above the linoleum"; and in failing to warn plaintiff of the unsafe condition.

Plaintiff's principal assignment of error is that the court improperly sustained defendant's objections to the introduction of opinion testimony by an architect called by plaintiff as an expert witness.

The plaintiff made an offer of proof of the expert's testimony subject to cross-examination, and the court stated his reason for excluding the testimony. To properly understand the question presented and the court's ruling, it is necessary to set forth the same:

## "DIRECT EXAMINATION

"Q Mr. Johnson, I don't recall exactly what you have answered and what you haven't. I am

going to ask you several questions concerning your visit out to the D & D Bowl. Were you out there yesterday?

"A   Yes.

"Q   And did you examine the floor in the area shown on Plaintiff's Exhibit H, the closest table to you in that picture?

"A   Yes.

"Q   And did you examine the vinyl flooring there?

"A   Yes, sir.

"Q   And the rug?

"A   And found there to be a half inch difference in the height.

"Q   Between the vinyl flooring and the rug?

"A   And the carpet.

"Q   And did you note the metal stripping there?

"A   Yes, sir.

"Q   On this picture here, Exhibit H, as well as on Exhibit J and on Exhibit 1 and Exhibit 3, I will ask you to particularly note the fact that each one of those tables shown in those pictures has five chairs at the table. Is that correct?

"A   Yes, it does.

"Q   And I particularly draw your attention to the chair at the—the single chair at the end of each table which is facing the alleys of the bowling alley. Do you note that?

"A   Yes, sir.

"Q   Now, taking into consideration the type of construction here, the vinyl and the rug and the metal strip with these chairs over there, in your opinion is this a safe practice, to put that chair over that area?

"A   No, it is not, because when you have an

activity such as sitting at a table where chairs are moved and slid around, you wouldn't have a metal edge like this in your own home around a dining-room and certainly not in a public building where you have people unfamiliar with the premises coming and moving chairs around this metal edge; when they walk up to it, they go and sit down and may be aware of the difference in color, texture of the floor coverings and be aware there is a carpet there but they would certainly not recall this at the time they sat in this fifth chair at the end of the table and had been sitting at the table for a period of time; when they would rise to go from there they would not necessarily recall that there was an unevenness in the floor and turn and be careful. The act of rising from a chair in this case, the metal edge is about where a person would place their foot when they rose from the chair; that the act of rising and turning, especially on one foot, you could very conceivably be off-balance if that foot were on that metal edge.

"Q What would be the fear that you would have if this type of use, such as is shown here, that we have been talking about were indulged in? What would you be afraid would happen?

"A Well, I would be afraid that people would slip and fall. The hazardous condition like this is asking for trouble, in my opinion.

"Q And specifically what about this construction, in your opinion, would make it more dangerous that people would slip and fall?

"A It's the unevenness of the floor. If that vinyl asbestos tile had been extended two feet further out into the carpeted area, then the movement of the chair and people with their feet in rising would have been on a level surface and much easier to do so; or the carpeting could have been extended to the wall and this, again, would have resulted in a level floor; and a third way, of course, is to put

underlayment under the vinyl asbestos tile and raise that floor material up to the carpeting.

"Q   Would it have been difficult to have constructed this so that the vinyl would have been on the same level as the rug?

"A   No. In fact, they have a—it apparently is not relevant but there is an additional hazard going down to the stairway there at that corner where this metal occurs because people coming cut the corner and would trip on that corner. It would have been far better had that edge, line that goes along the end of the table were extended, continuous so that you would not have that condition occurring at the head of the stairs or at the chair. Then people would have a more clearly defined line of demarkation as to where this edge was occurring. The edge in the courtroom, for example, is excellent because it occurs at the separation between the public seating area and the area of the proceedings.

"Q   Assume that the D & D Bowl had intended to use five chairs at these tables in this area and that it was designing the area for that purpose, would it have been a good construction practice or a proper construction practice to have constructed the floor as shown here in these exhibits and as the floor is actually constructed at the present time?

"A   Definitely not because as it is now constructed, it is doubtful whether it is satisfactory with four chairs because the two chairs at the end of the table are in a very similar position that when a person rises, which would be away from the bowling end or toward the end of the table, that they would be putting their foot on this uneven surface again. And certainly, with the addition of a fifth chair, that that change in elevation of the floor should occur at least two feet to three feet past the end of the table to give chairs and persons room to move on a level surface.

"Q   Are there any principles in construction practices in this area, Mr. Johnson, which do not

permit or frown upon the use of uneven flooring in areas where people are sitting?

"A    Again—

"Q    Public areas I am talking about.

"A    In public areas, a person is charged with— an architect is charged with the responsibility of designing in such a manner that you do have level surfaces and avoid these hazardous conditions such as this. We do have code requirements on stairways, for example, where you have a 3/16ths of an inch variation maximum on risers, which is a pretty strong requirement. But this is generally, the type of termination for carpeting in the courtroom is acceptable in the industry as long as it is fastened and maintained in a flat-type manner.

"Q    Would it, Mr. Johnson, in any way have interferred [sic] with the efficiency of the operation of the D & D Bowl, in your opinion, or in any similar enterprise if the floor in the area that we are talking about there had been level or, in other words, if this unevenness had been eliminated?

"A    Certainly not, on the two bases we talked about or mentioned before, that the vinyl asbestos tile could have been extended two or three feet out from the end of the table, this would not have altered their operation; if the carpeting had been extended under the tables to arrive at a level floor, this may have probably been a more difficult service to maintain for food spillage.

"MR. SCHWAB: That is all I have of this witness, Your Honor."

On cross-examination Mr. Johnson testified:

"Q    Your testimony then is, as I understand it, that the condition of unsafety stems from the position of the carpeting as placed there pursuant to the design?

"A    Yes.

"Q  The construction itself, so far as workmanship and safety are concerned, construction only, is good?

"A  Yes."

The trial court, in stating the reason for his ruling, stated:

"In Naney vs. Lane, they didn't need expert testimony to say whether that stripping was dangerous or not. You and I would know it as well as the expert would know it. There is nothing inherently or hiddenly dangerous. It is something that is dangerous or not as the reasonable person looks at it. It does not mean it is error to permit the expert to give his opinion. It is within the trial judge's discretion. * * * The factual situation, in my opinion, requires no expertise. There is nothing hidden or latent about it which isn't obvious to the average person as in the case of as the example I used in the construction of a bridge. That is the reason I ruled the way I did. I don't think Naney vs. Lane says you have to have expert testimony. As a matter of fact, it says that you didn't need expert testimony in Naney vs. Lane in so many words. There are some areas where expertise may probably invade the province of the jury and there is some area where it isn't proper. I feel like this is one where it isn't proper. With all due respect to Mr. Johnson, I see nothing about this particular construction which requires an expert to tell you that it is reasonably or unreasonably safe or unsafe, so that is why I didn't let him testify to it; * * *."

This assignment of error raises the question: When, after an expert witness has qualified, can a trial court properly exclude testimony of the expert witness? In support of her contention that the court erred in excluding such testimony by the expert witness, plaintiff relies upon the decision of this court in *Naney v. Lane*, 247 Or 367, 428 P2d 722 (1967), as

holding that in such a case an architect may properly testify whether the design or installation of flooring materials is safe, in his opinion.

In *Naney v. Lane,* plaintiff's husband [loss of consortium action] fell while going down a flight of stairs. He caught his heel on a metal strip which extended beyond the width of the matting on the stair tread. We held it was not error to permit "a licensed architect to testify concerning both the condition he personally observed and his opinion regarding the safety of the design or installation * * * [and] that it was proper to permit an architect to testify *under certain circumstances* regarding the safety of certain structural designs or installations." (Emphasis added.) To reach this result, we quoted as follows from *Ritter v. Beals et al,* 225 Or 504, 525, 358 P2d 1080 (1961).

> "The correct rule is that an expert's fitness to answer opinion questions must first satisfy the discretion of the trial judge. The expert then may express an opinion on an ultimate fact *if the ultimate fact cannot be equally well decided by the jury from the same evidence* upon which the expert has based his opinion [Citations omitted]. The decision whether to receive the testimony should be left to the sound discretion of the trial judge * * *." (Emphasis added.)

Thus, the rule of leaving the matter to the discretion of the trial judge, *under certain circumstances,* was upheld. This is a departure from the earlier cases that stated the expert testimony must be "required" before it was received, reasoning that a jury would be incapable of reaching accurate and correct conclusions without the benefit of such testimony. *Goodrich v. May et al,* 121 Or 418, 225 P 464 (1927); *Marks v.*

*Columbia County Lumber Co.,* 77 Or 22, 149 P 1041 (1915); *Nutt v. Southern Pacific Co.,* 25 Or 291, 35 P 653 (1894).

1. Generally, when appellate courts speak of the discretion of a trial judge, they refer to an exclusive power of free decision not revisable or reviewable by an appellate tribunal in the absence of abuse. This court, as well as most other authorities, has held that this rule of discretion applies when deciding if a witness has sufficient qualifications to qualify as an expert witness on the issues in a given case. *Denny v. Warren,* 239 Or 401, 408, 398 P2d 123 (1964); *Highway Com. v. Parker et al,* 225 Or 143, 162, 357 P2d 548 (1960).

2, 3. However, this cannot be the meaning of the term "discretion" when a judge is faced with a decision whether to admit certain testimony of an expert after he has been deemed qualified. At this point, he must apply certain principles of law to his decision and he is not free of revision or review. In the case at bar, it was not singularly a matter of discretion, but a question of law calling for an application of a rule of law to a particular set of facts. The true meaning of "discretion," when applied to the exclusion or admission of testimony from an expert witness, would be the power to make a choice from two or more legally valid solutions if supported by the facts. *Texas Indemnity Ins. Co. v. Arant,* 171 SW2d 915 (Tex Civ App 1943); Louis L. Jaffe, Judicial Control of Administrative Action (1965) at 586. When faced with an offer of proof, which may or may not be appropriate for jury consideration, the trial judge may, in certain circumstances, either admit or exclude the proffered testimony if he applies the correct principle of law and does not abuse his discretion.

Such a situation was present in both *Ritter* and *Naney*. In those cases the trial judges decided to admit the testimony and this court upheld the admission on the basis that it was within the trial judges' discretion.

The definitions and use of the term "discretion" are numerous, as aptly described by Rosenberg, "The Discretion of the Trial Judge and Its Implications," 4 Trial Judges Journal No. 3, p 4 (July 1965):

> "* * * Discretion * * * is a very slippery concept. * * * It occurs in a hundred forms in the trial judge's day-to-day work, bobbing up in every state and in every court. Yet the legal literature does not analyze, define or account for it in any coherent fashion. Neither do the decided cases. They bandy the terms 'discretion' and 'abuse of discretion' incessantly, but not helpfully. Indeed, it is hard to think of a subject of comparable sweep in the law that has suffered as much neglect."

For instance, this court stated in *Watson v. Dodson*, 238 Or 621, 622, 395 P2d 866 (1964):

> "During the trial the plaintiff asked leave to amend his complaint to 'conform to the proof.' The plaintiff's request was denied. The trial court said that the allowance of an amendment that would allege a new specification of negligence was not within the discretionary power of the court. In so holding, the court clearly misconceived the role of judicial discretion. The court had ample discretionary authority to allow the amendment [Citing cases]."

In some cases the expert who condemns the conduct of a defendant in evaluational terms gives ambiguous testimony. The conclusion may be based on technological facts or it may be unctuous criticism.[1]

---

[1] *See* C. Morris, The Role of Expert Testimony in the Trial of Negligence Issues, 26 Tex L Rev 1 (1947).

4. The decision of the trial judge is legally valid so long as that decision is based on the proper application of a rule of law to the facts involved. In this case the court is applying the rule of law to the proffered testimony of the expert. A close examination of the testimony, previously set forth and viewed most favorably for the plaintiff, offers nothing to aid or to help the jury to conclude the ultimate question framed by the pleadings: Was this faulty construction, therefore, constituting negligence? It is evaluational conclusions without reference to a technical or scientific opinion that would aid the jury. It could be classified as testimonial argument.

This court's most recent expression of the rule of law to be applied is stated in *Sandow v. Weyerhaeuser Co.*, 252 Or 377, 380, 449 P2d 426 (1969), wherein this court said:

"To warrant the use of expert opinion testimony, inferences being drawn must be so related to some science, profession, business or occupation that is sufficiently technical that a lay juror cannot be expected to be equally well qualified to form a worthwhile judgment [Citing cases]. Obviously, the question upon which the witnesses' opinion was sought was one which the average juror, *unaided,* would not have the skill to decide." 252 Or at 380. (Emphasis supplied.)

This is the rule set forth in 7 Wigmore, *Evidence* (3d ed) 21, § 1923:

"But the only true criterion is: On *this subject* can a jury from *this person* receive appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject * * *." (Emphasis his.)

There are situations, such as *Sandow,* where a jury clearly is not equally well qualified and needs help to find the truth. There are also situations where a jury clearly is equally qualified without help from opinion testimony such as offered here. It is the area between the clearly qualified and the clearly unqualified where the trial judge should be granted a certain latitude of decision in excluding or receiving expert opinion testimony.

We feel that the facts of this case present just such a situation, and the trial judge ruled correctly in excluding the expert's testimony.

Plaintiff's remaining assignment of error is that the trial court erred in sustaining defendant's objections to plaintiff's offer in evidence of a question and answer from plaintiff's deposition, which had been omitted when defendant had offered in evidence other portions of that deposition. In support of that assignment plaintiff contends that under the terms of ORS 45.260 if part of the deposition of a party is offered in evidence by the adverse party, the other party can then offer all other parts of the deposition which are relevant to the part already offered in evidence.

ORS 45.250 (1)(b) provides that the deposition of an adverse party may be used by the other party for any purpose, including substantive admissions. *Rich v. Tite-Knot Pine Mill,* 245 Or 185, 201, 421 P2d 370 (1966). ORS 45.260 provides that when one party offers in evidence part of such a deposition, the other party may then offer in evidence other parts of the deposition "so far as admissible under the rules of evidence."

5. In this case it appears that, upon the direct examination of plaintiff, the trial court had stricken from evidence and had instructed the jury to disregard a statement by plaintiff that her heel had "tripped over the metal stripping." Since it had apparently been conceded by plaintiff that she had not observed what it was, if anything, that she tripped over, that statement was stricken as an argumentative conclusion. No assignment of error has been taken by plaintiff from that ruling.

Later, upon offering portions of plaintiff's deposition in evidence, defendant omitted an almost identical statement by plaintiff that she "caught [her] heel on the strip * * * [and] fell * * *."

Thus, the trial court had previously ruled, in effect, that such a statement was not "admissible under the rules of evidence," within the meaning of ORS 45.260. Since, however, neither the entire transcript of testimony nor the entire testimony of the plaintiff on this subject has been included as a part of the record on this appeal, it is not possible to determine whether that ruling was in error or whether, as a result of that ruling, plaintiff suffered any substantial prejudice. Cf. *Coon v. Humble*, 238 Or 172, 174, 393 P2d 655 (1964). It follows that no reversible error resulted from the ruling.

The judgment is affirmed.

TONGUE, J., dissenting.

The majority states the issue to be decided in this case as follows:

> "When, after an expert witness has qualified, can a trial court properly exclude testimony of the expert witness?"

More specifically, however, this case presents the following four issues for decision:

(1) After an expert witness has qualified, does the trial court have unlimited discretion to exclude testimony of the expert witness, or must the trial court apply what the majority refers to as the correct "principles of law" in making that decision, with the result that "he is not free of revision or review," and will be reversed if he applies wrong "principles of law" in excluding such testimony?

(2) If so, what are the correct "principles of law" which (according to the majority) the trial judge "must apply" in making a decision whether to admit or exclude the testimony of a qualified expert witness in such a case?

(3) Did the trial judge apply the correct "principles of law" in making that decision in this case?

(4) If not, can this court affirm the exclusion of this testimony, or must it reverse and remand this case for a new trial with instructions to the trial judge to either admit this testimony or to consider and apply the correct "principles of law" in deciding whether to admit or exclude such testimony?

1. *The trial judge does not have unlimited discretion to admit or exclude expert testimony, but must admit such testimony if admissible on application of the proper "rule of law."*

On the first of these four issues the majority holds, and properly so, in my opinion, that this is not a case in which a trial judge has complete and absolute discretion (described by the majority as "an exclusive power of free decision not revisible or reviewable by an appellate court in the absence of abuse"). On the contrary, the majority properly holds that in this case

the decision to be made by the trial judge in the admission or exclusion of the testimony of this admittedly qualified expert witness was "not singularly a matter of discretion, but a question of law calling for an application of a rule of law to a particular set of facts" and that its decision on this question is "not free of revision or review."

It follows, under the majority opinion, that the trial judge must be reversed in this case if he did not apply correct "principles of law" in excluding such testimony.[①]

2. *The "principles of law" which "must" be applied in this case are that expert testimony is admissible whenever it can be of "appreciable help," "assistance" or "aid" to a jury.*

On the second of these four issues the majority holds, and also properly, in my opinion, that the cor-

---

① This is in accord with the view expressed by this court in State v. Lewis, 113 Or 359, 364, 230 P 543, 232 P 1013 (1924), as follows:

"Discretion is the power exercised by courts to determine questions to which no strict rule of law is applicable, but which from their nature and the circumstances of the case are controlled by the personal judgment of the court: Bouvier's Law Dict. It cannot be exercised where a strict rule of law is applicable as the term 'discretion' implies the absence of any such rule. *Where there is a clearly defined and well-settled applicable rule of law the courts are bound to enforce the rule and discretion is at an end.* Discretion, however, is not an arbitrary and unrestricted power, but must be exercised according to fixed and settled rules.

"Dean Pound, in his Readings on the History and System of the Common Law, at page 19, says: 'Four propositions may be laid down with reference to the exercise of discretion: (1) Whether or not a matter is one for law or for discretion is settled by law, and the court has no power to put it in the one category or the other at pleasure. *A court has no discretion to apply the law or not as it sees fit.* * * *.' " (Emphasis added)

rect "principle of law" which "must" be applied by the trial judge in this case is as follows, as stated in 7 Wigmore, Evidence (3d ed) 21, § 1923:

> "But the only true criterion is: On *this subject* can a jury from *this person* receive *appreciable help?* In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject \* \* \*."[2]

As the majority correctly points out, this is also the rule approved by this court, at least in effect, in *Sandow v. Weyerhaeuser Company,* 252 Or 377, 380, 449 P2d 426 (1969), thereby rejecting the rule adopted in earlier decisions by this court under which the testimony of an expert witness must be excluded unless "required" to enable the jury to understand the problem presented which must be of such a nature or so complicated that (as stated by the majority) "a jury would be *incapable* of reaching accurate and correct conclusions without the benefit of such testimony."[3]

---

[2] This result is also in accord with the following conclusions, as stated by McCormick, Opinion Evidence in Iowa, 19 Drake L Rev 245 (1970), at p 257:

> "The requirements for admissibility of expert opinion evidence require that the subject matter be such that *the opinion will aid* the jury on some question of fact before it. Definitions sometimes contain a qualification that the opinion must be on a matter which persons without such knowledge or training cannot correctly decide. However, such definitions are a throwback to the more rigid view excluding opinion testimony except in situations of necessity. Now it seems sufficient in Iowa if the subject matter is such that it is reasonably probable the expert's opinion will *help the jury* in its function in searching for the truth." (Emphasis added)

[3] Cases cited by the majority to that effect include Goodrich v. May et al, 121 Or 418, 255 P 464 (1927); Marks v. Columbia County Lumber Co., 77 Or 22, 149 P 1041 (1915); Nutt v. Southern Pacific Co., 25 Or 291, 35 P 653 (1894).

See also 7 Wigmore, *supra,* §§ 1941, 1951; Ritter v. Beals, 225 Or 504, 525, 358 P2d 1080 (1961), and Naney v. Lane, 247 Or 367, 369-370, 428 P2d 722 (1967).

3. *The trial judge erred in excluding the expert testimony because he applied the wrong (and now rejected) "principle of law" under which such testimony must be rejected unless "required" because the jury would otherwise be "incapable" of reaching a correct result.*

With all due respect, however, it is submitted that the majority has not properly considered and passed upon the third issue presented for decision in this case—whether the trial judge applied the proper and correct "principle of law" in excluding the testimony of the expert witness in this case. More specifically, the majority does not consider whether this trial judge, in excluding that testimony, applied the new and more recently approved rule, under which expert testimony must be admitted whenever it may be of "appreciable help," "assistance" or "aid" to the jury in reaching a correct decision of the problem presented to it, or whether, in making that ruling, he applied the old and now rejected rule, under which expert testimony must be rejected unless the problem involved was of such a nature or so complicated that the assistance of an expert on that subject was *"required"* because the jury otherwise would be *"incapable"* of reaching correct or accurate conclusions on such a subject.

It follows, of course, that if the trial judge, in rejecting the expert testimony, applied the old "required" and "incapable" rule, rather than the new, "appreciable help," "assistance" or "aid to the jury" rule, that ruling by the trial court was improper and in error, by the majority's own opinion, for failure to apply the "correct principle of law" in making that ruling. For the same reasons, if the trial judge re-

jected the expert testimony under the impression that he had free and unlimited discretion to do so, and without conscious application of the correct "principle of law," then that ruling was also improper and in error, by the majority's own opinion, for failure to apply the correct "principle of law."

Accordingly, we turn to the record to determine, if possible, what, if any, "principle of law" was applied by the trial judge in rejecting the expert testimony in this case. That he did not apply the correct rule in excluding that testimony is obvious from the quotation by the majority from the statement by the trial judge of his reasons for that ruling, in which he said:

> "* * * It is within the trial judge's *discretion* * * * The factual situation, in my opinion, *requires no expertise* * * * I see nothing about this particular construction which *requires* an expert to tell you that it is reasonably or unreasonably safe or unsafe, so that is why I didn't let him testify to it; * * *." (Emphasis added)

It is clear from this statement by the trial judge that he either was of the opinion that he had absolute and unlimited discretion to admit or reject this expert testimony or that he excluded it because of his understanding that the correct rule to be applied in making that decision was that such testimony must be rejected unless the "factual situation" was of such a nature, or so complicated, that expert testimony was *"required"* because the jury would be *"incapable"* of reaching an accurate conclusion without the benefit of testimony by an expert on the subject.

With all due respect to the majority, it is submitted that since it thus clearly appears from its own

opinion that the trial judge applied the wrong "principle of law" in making his decision whether to admit or exclude the expert testimony in this case, the trial judge erred in making that ruling. It follows that the judgment in this case must be reversed unless this court can say, *and as a matter of law,* that *even if* the trial judge had applied the correct "principle of law," this expert testimony *must* still have been excluded.

4. *The expert testimony was properly admissible upon application of the correct "principle of law" because it could have been of "appreciable help," "assistance" or "aid" to the jury.*

This brings us to the fourth and final issue presented for decision in this case—one requiring a consideration of the facts of the case, as well as the nature of the proposed testimony by the expert witness.

In considering the facts of this case it is important to bear in mind that this case involves a metal strip or "carpet bar" between the carpeting and the linoleum in a public place and extending one-half inch higher than the linoleum. In addition, it is important to bear in mind the *concealed location* of that protruding "carpet bar." Thus, the carpeting extended to and slightly under the edge of the table at which plaintiff was seated, with a chair over the edge of the carpeting. The remaining space on the floor under the table was covered by linoleum, with the one-half inch "carpet bar" between the linoleum and the carpeting. Thus, when plaintiff, after being seated at the table and on that chair, attempted to push back her chair and rise, she caught her heel on the "carpet bar" and fell, according to her testimony.

In considering the admissibility of the expert testimony under these facts it is also important to bear in mind defendant's explanation and defense, which was, among other things, to deny that this was improper construction or design and to contend that it is a common practice, familiar to everyone, to use such metal "carpet bars" at the edges of carpeting in public places; that plaintiff was familiar with that practice and that there was nothing improper in the construction or design of the bowling alley by the location of the "carpet bar" under the edge of the table at which plaintiff was seated.

It was in this context that plaintiff offered the following testimony by an architect who was an admittedly qualified expert witness:

"Q Now, taking into consideration the type of construction here, the vinyl and the rug and the metal strip with these chairs over there, *in your opinion is this a safe practice,* to put that chair over that area?

"A *No, it is not,* because when you have an activity such as sitting at a table where chairs are moved and slid around, you wouldn't have a metal edge like this in your own home around a diningroom and certainly not in a public building where you have people unfamiliar with the premises coming and moving chairs around this metal edge; when they walk up to it, they go and sit down and may be aware of the difference in color, texture of the floor coverings and be aware there is a carpet there but they would certainly not recall this at the time they sat in this fifth chair at the end of the table and had been sitting at the table for a period of time; when they would rise to go from there they would not necessarily recall that there was an unevenness in the floor and turn and be careful. The act of rising from a chair in this case, the metal edge is about where a person would place their foot

when they rose from the chair; that the act of rising and turning, especially on one foot, you could very conceivably be off-balance if that foot were on that metal edge.

\* \* \* \* \*

"Q   Assume that the D & D Bowl had intended to use five chairs at these tables in this area and that it was designing the area for that purpose, *would it have been good construction practice or a proper construction practice to have constructed* the floor as shown here in these exhibits and as the floor is actually constructed at the present time?

\* \* \* \* \*

"A   *Definitely not* \* \* \*

\* \* \* \* \*

"Q   Are there any *principles in construction practices in this area,* Mr. Johnson, which do not permit or frown upon the use of uneven flooring in areas where people are sitting?

\* \* \* \* \*

"A   In public areas, a person is charged with— *an architect is charged with the responsibility* of designing in such a manner that you do have level surfaces and avoid these hazardous conditions such as this. We do have code requirements on stairways, for example, where you have a 3/16ths of an inch variation maximum on risers, which is a pretty strong requirement. \* \* \*."④ (Emphasis added)

The majority quotes four full pages of the offer of proof (including this testimony) and then, without reference to or analysis of any specific testimony,

----

④ In addition, the question originally asked of this witness and which was the basis for the offer of proof, was:

"Q   In this area where the carpeting joins the linoleum in the vicinity of this particular table, and after your examination, *did this conform to good architectural practices in the community* and in the State of Oregon." (Emphasis added)

would summarily dismiss the entire offer of proof by the statement that "it offers nothing to aid or help the jury to conclude the ultimate question framed by the pleadings: Was this faulty construction, therefore, constituting negligence?"

In *Naney v. Lane,* 247 Or 367, 428 P2d 722 (1967), plaintiff's decedent fell down a flight of stairs. On the edge of one of the top steps was a *raised aluminum strip,* claimed to be the cause of the fall. The majority opinion concedes that under the facts of that case it was proper for the trial judge to permit an architect to testify that in his opinion such a condition "could catch something, on the shoes of anyone going down the steps" and was *"not a safe design."*

In numerous cases in other states involving safety of design and construction expert witnesses have been permitted to testify that such design or construction was, or was not safe, in the opinion of such experts.[6] None of these cases or other authorities on

---

[6] Among such cases involving design or construction of stairs, steps or floors with different levels, see Morgan v. Washington Trust Co., 105 RI 13, 249 A2d 48, 51 (1969); Millar v. Tropical Gables Corp., 99 S2d 589, 590 (Fla 1958); Capital Transit Co. v. Webb, 142 F2d 757 (DC Cir 1944); McCrory's Stores Corp. v. Murphy, 164 SW2d 735, 742 (Tex 1942); Trame v. Orpheum Theatre Co., 60 Ohio App 323, 21 NE2d 178, 180 (1939); McStay v. Citizens National Trust & Savings Bank, 5 Cal App 2d 595, 43 P2d 560, 562 (1935); and Hommel v. Badger State Investment Co., 166 Wis 235, 165 NW 20, at 22 (1917).

See also cases in which such evidence was both admitted and excluded, as cited in 146 ALR 37; 62 ALR2d 1451; 7 Wigmore, Evidence (3d ed) § 1951, note 1, pp 68-81 and 1970 Pocket Supplement, pp 25-31. See also Morris, The Role of Expert Testimony on the Trial of Negligence Issues, 26 Tex L Rev 1 (1947).

For other Oregon cases, see Nutt v. Southern Pacific Co., 25 Or 291, 296, 35 P 653 (1894); Scott v. Astoria Railroad Co., 43 Or 26, 38, 72 P 594 (1903); and Goodrich v. May et al, 121 Or 418, 420, 255 P 464 (1927), among other cases.

this question was referred to or given any consideration by the majority opinion.

Indeed, the question presented by this case is similar to the question presented in *Morgan v. Washington Trust Co.*, 105 R.I. 13, 249 A2d 48, 51 (1969), in which the doors at the entrance of a bank were designed to swing outward and over a vestibule or platform and plaintiff, on entering the bank, fell when she "pulled" on one of these doors. In holding that the testimony of an architect was admissible in that case the court said (at p 51):

> "From the pictures which are in evidence, the entranceway to defendant's bank appears to the untutored eye to be perfectly safe. It is only when a trained individual such as plaintiff's architect compares the outward swing of the new doors with the depth of the platform, and when he explains the difficulty encountered by a person of short stature in reaching up and pulling open the door that the hazards that may surround entry into the bank become apparent. * * *."

Thus, the admission of expert testimony in *Naney v. Lane, supra,* that the raised metal "strip" on the edge of the edge of the steps of a stairway was not a "safe design" and explaining the reasons why it was an unsafe design was consistent with the holdings of other courts in numerous similar cases.[6]

Accordingly, it is my opinion that upon application to the facts of this case of the same "correct principle of law" for application in cases involving the issue of safety of design or construction, it follows that the testimony of the architect that the construction of

---

[6] See also Eberle v. Benedictine Sisters, 235 Or 496, 499, 385 P2d 765 (1963). In *Sandow, supra,* no problem of design or construction was involved.

the bowling alley involved in this case did not conform to "safe" or "proper practices" or to "good architectural practices in the community" and his explanation of why it was an unsafe and hazardous design should have been admitted in this case.

It may be that a jury of ordinary persons could understand, without expert testimony, that the joining of a carpeted area to a linoleum area with a "carpet bar" one-half inch high would, or would not, be dangerous. It is my opinion, however, that the testimony of a qualified architect that such a manner of design or construction would or would not be considered by architects to be a "safe" or "proper" construction practice or one in accordance with "good architectural practice in that community," together with his explanation of why it was or was not unsafe and hazardous, for reasons which might not occur to the ordinary person, would be of "appreciable help" to a jury in fully understanding the problem and in reaching a proper decision on that issue.[7]

This result is also consistent with cases involving issues of care, reasonableness and safety, in which it has been held by this court that practices by other employers or operators, even though not so universal as to constitute an industry-wide practice or custom

---

[7] In Lehman v. Knott, 100 Or 59, 196 P 476 (1921), in which expert opinion testimony was rejected as "invading the province of the jury," this court made a distinction (at p 71) between opinion testimony that surgical treatment was "proper" (held to be admissible) and treatment that was "unskillful and negligent" (held to be inadmissible). That distinction was criticized by 7 Wigmore, Evidence, *supra*, at p 78, with the comment: "Here are Tweedle-dum and Tweedle-dee in the saddle again." Similarly, any distinction in this case between expert opinion testimony that a practice is "safe," "proper" or "customary," does not appear to be supported by most of the cases and authorities referred to in note 4, above.

and even though limited in number, are nevertheless admissible "as a matter of evidence assisting the jury to judge what is ordinarily safe" by showing how other operators have dealt with similar problems. *Silver Falls Timber Co. v. Eastern & Western Lumber Co.*, 149 Or 126, 179, 40 P2d 703 (1935).

This is also consistent with the views of this court as stated in the more recent decision of this court in *Rich v. Cooper*, 234 Or 300, 380 P2d 613 (1963), in which we said (at pp 311-312):

> "It is stated generally that the admissibility of demonstrative evidence is within the discretion of the trial court. However, this does not mean that the trial court may arbitrarily exclude such evidence. *If the evidence is material and relevant, it must be received unless there is some reason for excluding it. * * *.*" (Emphasis added)

Thus, with all due respect to the views expressed by the majority, it is my opinion that if the trial judge had applied the "correct principle of law" in this case (which he clearly did not do), the testimony of the architect was admissible in this case.

In concluding this opinion on this issue, however, the majority states:

> "There are situations, such as *Sandow*, where a jury clearly is not equally well qualified and needs help to find the truth. There are also situations where a jury clearly is equally qualified without help from opinion testimony such as offered here. It is the area between the clearly qualified and the clearly unqualified where the trial judge should be granted *a certain latitude of decision* in excluding or receiving expert opinion testimony.
>
> "We feel that the facts of this case present just such a situation, and the trial judge ruled correctly

in excluding the expert's testimony." (Emphasis added)

Assuming that the majority may be correct in the statement that in this "area" the trial judge should be allowed "a certain latitude of decision," it still does follow that "the trial judge ruled correctly in excluding the expert's testimony." This is because, as stated by the majority, the trial judge must apply the "correct principle of law" in deciding whether to admit or exclude such testimony.

As previously demonstrated, the trial judge in this case did not exclude the testimony of this expert because he did not think that such testimony could not "help," "assist" or "aid" the jury in understanding the extent of the hazards or in reaching a correct result upon the "ultimate question" whether there was faulty construction or design. Indeed, we do not know what the ruling of the trial judge would have been had he considered the offered testimony of this qualified architect by the application of that test—which the majority concedes to be the "correct rule of law" which a trial judge "must apply" in such a case.

Instead, the majority holds that this court may decide for itself that it was proper to exclude the testimony of this qualified architect that the placing of the one-half inch "carpet bar" under the edge of a table, with a chair over it, was not "proper" or "safe design" or in accord with good "architectural practice in the community," as well as his testimony explaining why this concealed "carpet bar" was unsafe and hazardous. Moreover, the majority does so upon the apparent ground that this court may properly hold and, as a matter of law, that such testimony could not "help," "assist" or "aid" the jury in understanding the prob-

lem and reaching a correct decision whether the "design" or "construction" was unsafe. Not only is this decision by the majority contrary to previous and recent decisions by this court and other courts (as cited above), but it would have this court usurp what the majority says is the "latitude" to be "granted" to and exercised by the trial judge in this case.

Accordingly, it is my opinion that the judgment in this case should be reversed and that this case should be remanded for a new trial, either with instructions to admit the offered testimony of the architect or with instructions that the trial judge must reconsider the admissibility of that testimony by proper application of what the majority holds to be the correct "principle of law" which the majority says "must be applied" by the trial judge in this case.

The admission of expert testimony on matters involving safety of design or construction is not exclusively for the benefit of plaintiffs. Expert testimony that design or construction is safe or in accordance with good architectural practice, when offered by defendants, is subject to the same rule.

It may be that the holding by the majority that the trial judge must be affirmed in this case for excluding almost the same identical expert testimony relating to the safety of construction or design of a raised metal strip that the trial judge in *Naney v. Lane, supra,* was affirmed for admitting may serve to bolster the prerogatives of trial judges. In my opinion, however, the more important consideration is that it is not in the best interests of either lawyers or litigants —or in the interests of the public in good judicial administration—to establish a precedent under which one judge will be affirmed for rejecting the same evidence

that another judge was affirmed for admitting (in *Naney v. Lane, supra*). Such a result is also directly contrary to the proper meaning of "judicial discretion," expressly recognized by the majority and as previously defined by this court in *State v. Lewis, supra*.

For all of these reasons, I most respectfully dissent from both the views expressed by the majority opinion and the result reached by the majority in this case.

O'CONNELL, C.J., and HOLMAN, J., join in this dissent.