Argued July 7, affirmed September 5, 1975

TIJERINA, *Respondent, v.* CORNELIUS
CHRISTIAN CHURCH, *Appellant.*

539 P2d 634

*Carrell F. Bradley,* Hillsboro, argued the cause for appellant. With him on the brief were Larry A. Brisbee and Schwenn, Bradley, Batchelor & Bailey, Hillsboro.

*Noreen K. Saltveit,* Portland, argued the cause for respondent. With her on the brief was John C. Barrett, Portland.

O'CONNELL, C. J.

This is an action to recover damages resulting from personal injuries suffered by plaintiff on defendant's premises. Defendant appeals from a judgment entered on a jury's verdict in plaintiff's favor.

Plaintiff was injured on June 25, 1972, while participating in a non-competitive softball game conducted by defendant church in connection with its Sunday school program. Plaintiff, who had never before played softball, had run to first base on his second time at bat and was running toward second base when he fell, fracturing his left tibia and fibula. Plaintiff testified that he had stepped in a hole. Two witnesses testified that near the scene of plaintiff's fall there were potholes which were hidden by dry weeds or loose

dirt. Another player testified that after plaintiff's injury he located scuff marks in a hole approximately eight inches wide and four inches deep in the immediate area where plaintiff fell. Other players testified that they could find no holes in the area.

As a result of his injury, plaintiff was required to wear a cast for several months and was unable to work for eight months. The injury had caused plaintiff's left leg to be shorter than his right, requiring him to wear a ½-inch pad across the sole of his shoe and impairing his ability to run or walk on uneven ground. He now suffers progressive traumatic arthritis.

Defendant is a religious organization located within the boundaries of the city of Cornelius, Oregon. The softball field on which plaintiff was injured occupies the west end of a 3½-acre parcel, the east end of which is occupied by defendant's church building. Defendant obtained the property in 1969 and constructed a baseball backstop in 1971. Prior to defendant's use, the land was planted to grain. Adjacent land is still used for agricultural purposes. Defendant's property produces a substantial growth of volunteer grain and various weeds which defendant is obligated to mow to comply with fire regulations. In 1974, the field was mowed by a third person who was given the clippings for his efforts.

Defendant held the field open to the general public without restriction. The open portions of the property, including the softball field, often were traversed by horse and motorcycle riders, producing ruts and holes in the field some of which were obscured by the overgrowth of vegetation. The mowing of the field tended to cut the weeds off more or less evenly, as a result of which the surface formed by the stubble was smoother than the ground itself.

On June 11, 1972 (two weeks before plaintiff's

fall), the subject of the condition of the field was taken up at one of defendant's monthly business meetings. Two of defendant's deacons, responsible for the maintenance of the church property, reported that previously they had inspected the field and discovered holes and ruts. Mr. Young, one of these deacons, who had considerable experience in the construction and maintenance of Little League fields, stated at the meeting that, in his opinion, the field was unsafe and would require rototilling to make it playable. A motion was then made calling for the repair of the field and for the construction of a fence to prevent continued horse and motorcycle traffic across the playing field. The minister of the defendant church objected to fencing the field as inappropriate to a community church. The matter was referred to the board of trustees and no action was taken by the board before plaintiff's injury.

At about the same time defendant, through a church bulletin, invited its members and their families to attend a picnic and softball game on the field on June 25, 1972. The bulletin did not refer to the dangerous condition of the field. A week before the picnic and game a group of church members used dirt taken from around the church building to fill some of the holes on the diamond.

On the day of his fall, plaintiff attended church with his family. They had brought food to contribute to the potluck picnic. Plaintiff, who had never before played softball, was invited to do so by a church trustee. After some initial hesitation, he accompanied the trustee onto the field. A short time later the fall which caused his injury occurred.

The case was submitted to the jury on a special verdict form. The jury found that plaintiff had not assumed the risk of his injuries and was not negligent, that defendant was negligent and that defendant's

negligence was a cause of the accident. They found for plaintiff in the sum of $59,363.17.

■ Defendant raises several grounds for reversal, the first of which is the assertion that the trial court erred in refusing to hold that defendant's softball diamond was agricultural land, excluding recovery under ORS 105.655-105.680.[1] Defendant did not raise this issue as an affirmative defense[2] in its answer or otherwise give notice of its intent to defend against plaintiff's claim on the ground of the character of the land until after all the evidence was in. Under these circum-

---

[1] ORS 105.665 provides as follows:

"Except as otherwise provided in ORS 105.675:

"(1) An owner of land owes no duty of care to keep the land safe for entry or use by others for any recreational purpose or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering thereon for any such purpose.

"(2) An owner of land who either directly or indirectly invites or permits any person to use his land for any recreational purpose without charge does not thereby:

"(a) Extend any assurance that the land is safe for any purpose;

"(b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed; or

"(c) Assume responsibility for or incur liability for any injury, death or loss to any person or property caused by an act or omission of that person."

ORS 105.655(2) clarifies the limitation of duty by defining "land" restrictively:

"(2) 'Land' means agricultural land, range land, forest land, and lands adjacent or contiguous to the ocean shore as defined by ORS 390.605, including roads, bodies of water, watercourses, private ways, private buildings and structures on such lands and machinery or equipment on the land when attached to the realty, but shall not include lands described in ORS 390.605 to 390.770."

[2] See ORS 16.290(2)(b): "The answer of the defendant shall contain: * * * A statement of any new matter constituting a defense or counterclaim, in ordinary and concise language, without repetition." See Ackerman v. Phys. & Surgeon's Hosp., 207 Or 646, 288 P2d 1064, 298 P2d 1026 (1956).

stances, plaintiff was entitled to have the issue excluded from the case on appeal.

Nonetheless, the record is sufficient for us to determine that defendant's land does not come within the limitations of duty established by ORS 105.665.

Defendant contends that its land is agricultural land because it produces vegetation normally grown for agricultural purposes and which is harvested in the sense that after the growth is cut it is removed and put to use and, furthermore, because the land is suitable for commercial farming.

■ The legislative history of ORS 105.655-105.680 leaves no doubt that the legislature intended by the restrictive definition of land in ORS 105.655(2) to limit its application to landholdings which tended to have recreational value but not be susceptible to adequate policing or correction of dangerous conditions.[9] The restrictive definition was introduced by amendment to a proposed grant of immunity to owners of all land opened to recreation with the express purpose of avoiding a grant of immunity to all recreational land. Thus "agricultural land" must be interpreted narrowly in light of the legislative purpose.

■ Defendant's land is not used for commercial farming. The grain which grows on it is volunteer and intermixed with weeds. This "crop" has been cut to comply with fire regulations but was not "harvested" until 1974, after the initiation of this lawsuit and even then only in the sense that the person who cut it was allowed to take it away in return for his labors. The fact that the land could be farmed does not distin-

---

[9] Remarks of Ward Armstrong before House Subcommittee on Natural Resources, 56th Legislative Assembly, May 19, 1971, Tape No. 11, side 2, State Archives; Report of Representative Hanneman to full House Committee, Tape 11, side 2. *See,* House Minutes, May 19, 1971 at page 3.

guish it from most of the land in Oregon. We think it clear that defendant's land is not of the narrow class to the owners of which the legislature intended to extend immunity from liability for dangerous conditions.

■■ Defendant also makes numerous allegations of error relating to the submission of the question of plaintiff's status (as invitee or licensee) on defendant's land. We need not determine whether the trial court erred in this regard, however, because there was no prejudice to defendant's position. There can be no question that defendant had full knowledge of the dangerous condition of the field at least two weeks before plaintiff's fall, when its own deacons explained the condition of the field, the potential for injury, and the appropriate corrective measures. When the possessor of land has knowledge of a risk unknown to the plaintiff which the condition of the land creates, he is under a duty to warn which runs equally to an invitee or licensee.[4]

■■ Defendant also assigns as error the admission of the testimony of Mr. Young, alluded to above, to the effect that the field was in a condition rendering it unsafe for the purpose of engaging in a softball game. In this connection, the witness was permitted to testify over objection as to his opinion of the relative safety of the field in question as compared with a field properly prepared for organized softball. He was permitted to testify as to the measures which would have to be taken by defendant to put the field in a safe and useable condition. In qualifying Mr. Young to testify in this respect, it was brought out that he had several years of experience in preparing Little League baseball fields.

[4] Wilsey v. Campbell, 255 Or 420, 467 P2d 964 (1970). 2 Harper & James, Law of Torts § 27.9, p. 1472 (1956); Prosser on Torts § 60, p. 391 (3d ed 1964).

Although defendant concedes that Mr. Young was qualified to testify as to the proper condition of a field to provide a safe place to play softball, "the expert opinion testimony regarding the relative safety of the condition of the field was of no help to the average juror," because the average jury "was as able as anyone else to say whether the conditions of the field posed any danger and whether it was safe."

The test for the admissibility of expert testimony is whether the jury can receive appreciable help from it.[9] The proper preparation and maintenance of softball and baseball diamonds must take into account the manner in which the players might use the field, the dangers to which they are exposed, and the measures necessary to avoid injury in the course of play. Although many jurors may know of these factors, many may not. Those who do not could receive appreciable help in assessing the minimum standard of maintenance for softball playing fields. Therefore, we are of the opinion that the expert testimony in this case to which defendant objects was admissible.

██ Defendant's final contention is that the court erred in allowing the jury to consider plaintiff's claim for damages for lost overtime wages. Damages may be recovered for lost overtime if there is evidence that plaintiff previously earned a certain amount during a given period of time from the same employer for doing the same work under the same conditions. *McVaigh v. Sandberg*, 266 Or 409, 513 P2d 801 (1973). In addition to his own testimony that he had been able to accept less overtime after his return to work, plaintiff introduced his payroll records from the first of February 1971, when he commenced his present employment, through December 1973. The records dis-

---

[9] 7 Wigmore on Evidence (3d ed 1940) § 1923; Yundt v. D & D Bowl, Inc., 259 Or 247, 258 and 259, 486 P2d 553 (1971).

closed the amounts of overtime plaintiff had worked both before and after the accident and were sufficient to allow the jury to determine plaintiff's loss.

Defendant asserts in support of its contention that "there was a sharp conflict in the evidence of the plaintiff as to whether plaintiff had declined to work overtime." Conflicts in the evidence are within the province of the jury. The jury has resolved the conflict of evidence on this issue in plaintiff's favor. The verdict is supported by substantial evidence and there is no prejudicial error.

Affirmed.

HOWELL, J., specially concurring.

While I have serious doubts that the average juror needs an expert witness to tell him the difference between a backyard pasture and an improved baseball field, I do not believe that such evidence was of any particular significance in this case. However, I do not believe that the test of admissibility of such evidence is whether or not expert evidence could be of help to a jury. If the expert opinion evidence is related to some technical field, it is admissible. If the jury is equally well qualified to find the truth or the subject is a matter of common knowledge, expert opinion evidence is not admissible. In the gray area in between we have held that the admissibility of such evidence is within the discretion of the trial judge. *See Yundt v. D & D Bowl, Inc.,* 259 Or 247, 486 P2d 553 (1971); *Cooney v. McGee,* 268 Or 521, 521 P2d 1051 (1974).